**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Charles W. WESTBROOK,**
**Defendant–Appellant.**

**No. 96–3167.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 14, 1997.

Decided Sept. 3, 1997.

Frances C. Hulin, David E. Risley (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

Eric M. Schwing (argued), Babette P. Salus, Schwing & Salus, Springfield, IL, for Defendant–Appellant.

Before RIPPLE, MANION and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.

Following a jury trial, Charles W. Westbrook was found guilty of conspiracy to distribute cocaine base (crack) in violation of 21 U.S.C. §§ 846 and 841. He was sentenced to 188 months of imprisonment followed by a five-year period of supervised release. On appeal he requests our consideration of three issues: the district court's denial of his motion to suppress statements made after his arrest, its refusal to admit evidence of gang affiliation at trial, and its denial of his motion to find unconstitutional the federal crack cocaine laws and the corresponding sentencing guidelines. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

I

BACKGROUND

On January 30, 1995, while traveling in their patrol car on South Grand Avenue in Springfield, Illinois, State Troopers Brad Carnduff and Donald Buckley spotted a possible burglary in progress. They observed a man (later identified as Charles Westbrook) looking back over each shoulder and then squeezing through the cracked-open doorway of room 228 on the second floor of the Red Roof Inn. The officers drove back and watched room 228 from an adjoining parking lot. Parked in front of the room was a green Chevrolet Caprice occupied by a woman later identified as Charles Westbrook's wife, Sonya Westbrook. The troopers saw Mr. Westbrook leave room 228, come down the stairs, talk with his wife, return to room 228, and then leave the room again, this time with another man (later identified as Charles Dean). When the two men came down the stairway they were out of view of the troopers for one or two minutes. The officers then watched the men walk to the Chevrolet, get in and drive away.[1]

---

1. When Charles Dean testified at trial, he presented a different version of the departure from room 228. He claimed that Mrs. Westbrook met him and her husband on the stairs to tell them that two state police officers were parked nearby. He testified that the three of them got into the car and that he then got out of the car, returned to room 228 by himself, came down the stairs

When the green Chevy did not appear on the main highway as they had expected, the troopers began looking for it. Finding the car parked unoccupied on a car dealership lot near the Red Roof Inn, they checked the car's vehicle identification number and license plate number and learned there was no registered owner. Shortly thereafter, Mrs. Westbrook returned to the car. She first denied that she had been in the car and then gave conflicting stories to the troopers about the ownership of the car. When Mr. Westbrook came up, the officers learned that neither Westbrook had a valid driver's license or car insurance. The troopers told the Westbrooks they could not move the car without a licensed driver and proof of insurance; the Westbrooks replied that their friend had gone back to the motel to get his driver's license and that they would walk home to arrange for insurance.

After the Westbrooks left, Trooper Buckley stayed at the Westbrooks' car and Trooper Carnduff returned to the Red Roof Inn to tell the Westbrooks' friend about the needed insurance. The officer did not find their friend but did find crack cocaine buried in the mulch area behind the motel. Trooper Carnduff radioed Trooper Buckley that he had found "a lot of" narcotics, and then requested assistance. Master Sergeant Avart arrived to help Trooper Carnduff collect, photograph and secure the crack cocaine in the Master Sergeant's squad car. Master Sergeant Locke went to the car dealership and stayed with the Westbrooks' car while Trooper Buckley drove to the Red Roof Inn to see the crack.

A few minutes after Officer Buckley returned to the dealership, a taxicab brought the Westbrooks back to their car. Trooper Buckley placed them under arrest and advised Mr. Westbrook he was being arrested for possession with intent to distribute a controlled substance. He ordered the Westbrooks to lie on the ground; when Trooper Locke returned to assist Trooper Buckley, the two officers handcuffed Mr. and Mrs. Westbrook, placed them each in separate squad cars and transported them to the Red Roof Inn. No *Miranda* warnings were given at this point.

As Trooper Buckley approached the Red Roof Inn with Mr. Westbrook in his squad car, Mr. Westbrook looked toward the area where the crack cocaine had been found and said, "Man, I didn't know anything about that stuff." R.74 at 109. The officer told Mr. Westbrook to relax and assured him that someone would come to speak to him soon. Trooper Buckley then exited the squad car and left Mr. Westbrook, handcuffed and unattended, for approximately 45 minutes. While Mr. Westbrook was waiting in the squad car, he testified, he yelled out to Officer Carnduff; and when Officer Carnduff opened the driver's door of the squad car, Mr. Westbrook told him that the drugs were not his.[2] Neither trooper gave Mr. Westbrook his *Miranda* warnings during this time.

Special Agents O'Neal and Fisher of the Illinois State Police Enforcement Group, a drug task force, then arrived at the motel. They directed that the Westbrooks be taken to the Investigations Office and placed in separate interview rooms. Mr. Westbrook was interviewed by Agent O'Neal, Mrs. Westbrook by Agent Fisher. Mr. Westbrook and Agent O'Neal gave diametrically different accounts of the interview. At the suppression hearing, Mr. Westbrook testified that Agent O'Neal never advised him of his *Miranda* rights; rather, he simply handed Mr. Westbrook some papers and "told me to initial here, here, here." R.52 at 12. Agent

---

and buried 10 ounces of crack cocaine under a pine tree behind the Red Roof Inn. Dean testified that, when he was burying the cocaine in the mulch, Mr. Westbrook "just came up and he was walking back toward the car." R.74 at 200.

2. Trooper Carnduff testified at trial that Mr. Westbrook made a more expansive statement. When the officer responded to Mr. Westbrook's head-motioning gesture by coming over to the driver's side of the squad car, Mr. Westbrook nervously told the officer that the dope was not his, that he was just a runner, that he could not afford an ounce of it, and that the person with him earlier had hidden it. Trooper Carnduff told Mr. Westbrook to hold his comments until the agents arrived. Trooper Buckley also testified at trial that Mr. Westbrook stated to him, "man, I can't afford an ounce of that stuff, let alone that much." R.74 at 111.

O'Neal testified that he took Mr. Westbrook's personal history, read Mr. Westbrook his *Miranda* rights and gave him a written form with those rights, each of which Mr. Westbrook read and initialed after stating that he understood it. Afterwards, stated the officer, Mr. Westbrook signed a waiver of those rights and agreed to give Agent O'Neal a written statement. In that statement Mr. Westbrook said he had met a person the previous day named Kevin Dean [3] who paid Mr. Westbrook $20 to give him a ride from Evergreen Terrace to the Red Roof Inn and who then paged Mr. Westbrook later that day to come pick him up at the Red Roof Inn. According to Mr. Westbrook, he just had returned to that motel, after being paged, when the police saw him.

At some point during Mr. Westbrook's interview, Agent Fisher came into the room. Again the testimony of Mr. Westbrook differs significantly from that of Agent O'Neal. According to Mr. Westbrook, Agent Fisher held up a bag of marijuana and said, "Look what I found." R.52 at 13. He then told Mr. Westbrook that, if Westbrook cooperated in finding Kevin Dean, nothing would be said about the marijuana. Mr. Westbrook made his written statement for Officer O'Neal at that time. Agent O'Neal, however, testified that Mr. Westbrook signed the *Miranda* form, after being advised of each right, and that he agreed to waive his rights and signed the waiver portion of the *Miranda* form. According to the agent, Mr. Westbrook then wrote out a statement, voluntarily and without guidance from the officer. Agent O'Neal also testified that Agent Fisher came into the room with a bag of marijuana at some point, but the timing of the other agent's arrival was never clarified. Agent O'Neal denied that Mr. Westbrook was told that, if he cooperated, nothing would be said about the marijuana. Mr. and Mrs. Westbrook were released following their interviews but were told that the investigation would continue.

Some time later, in an unrelated investigation, Charles Dean (the man Mr. Westbrook had identified as "Kevin" Dean) was charged in the Southern District of Illinois with conspiracy to distribute cocaine. Dean pleaded guilty and agreed to cooperate with the government concerning any illegal activities in which he was involved. Pursuant to his plea agreement, therefore, Dean gave information about his criminal involvement in this investigation. When Agent O'Neal interviewed him, Dean told the officer about the events of January 27–30, 1995, and about the arrangement he had with Mr. Westbrook. Dean also testified at Mr. Westbrook's trial.[4] Dean, Mr. Westbrook and the police officers presented three versions of the facts that differed significantly in their content.[5] On

---

**3.** Mr. Westbrook misidentified Charles Dean as Kevin Dean.

**4.** Dean's testimony at Mr. Westbrook's trial provided this information: Dean knew Charles Westbrook when they were growing up in East St. Louis. In 1993, Mr. Westbrook moved to Springfield, Illinois. Dean and Westbrook met again in mid–1994 at a friend's home in Springfield. Dean was in the drug business; his family and friends knew it. Some weeks later, Mr. Westbrook drove to East St. Louis looking for Dean. According to Dean, Mr. Westbrook wanted Dean to start fronting him cocaine to sell in Springfield, Illinois. Although Dean initially was hesitant, in January 1995 he agreed to supply cocaine to him. On Friday, January 27, 1995, Dean brought to Mr. Westbrook's house, kilogram (9 ounces) of powder cocaine. Together they cooked the cocaine into 13 ounces of crack and packaged it in one-ounce quantities. Dean stayed in room 228 of the Red Roof Inn that weekend; Mr. Westbrook sold the packages over the weekend, keeping Dean advised of his progress.

On Monday, January 30, Mr. Westbrook came to the Red Roof Inn to arrange an additional sale of 4+ ounces of crack for $3,200. Dean testified that he said he would page Mr. Westbrook when Dean was ready to deliver the crack. When Dean paged him, Mr. Westbrook returned to the Red Roof Inn with his wife. The two troopers, Carnduff and Buckley, noticed Mr. Westbrook as he glanced over his shoulders when he slid through the narrow doorway into Dean's room. They began the vigil of room 228 that led to Mr. Westbrook's arrest later that afternoon.

**5.** At trial Mr. Westbrook testified that he never agreed to help Dean distribute crack. He claimed that Dean came uninvited to his house and suggested that Mr. Westbrook "get part of a little drug ring"; Mr. Westbrook stated he declined. R.76 at 419. On January 30, 1995, Dean flagged Mr. Westbrook down and asked for a ride to the motel. Mr. Westbrook gave Dean his pager number so that Dean could call when he was ready to be picked up. When Mr. Westbrook went to Dean's room, he noticed a gym bag with crack cocaine inside. He then went

March 29, 1996, following a three day trial, the jury found Mr. Westbrook guilty of conspiracy to distribute crack cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1). He was sentenced to 188 months of imprisonment and five years of supervised release. This appeal followed.

## II

## DISCUSSION

### A. *Motion to Suppress*

■ Mr. Westbrook sought to suppress both his oral statements to Troopers Carnduff and Buckley at the Red Roof Inn and his written statement made later during Special Agent O'Neal's interrogation. He submitted that the statements were obtained in violation of his Fifth Amendment *Miranda* rights and were coerced. Following a hearing, the district court denied Mr. Westbrook's motion to suppress. We review the appeal of that decision under the two-pronged standard set forth in *Ornelas v. United States*, — U.S. —, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), and its progeny. The *Ornelas* Court established that appellate courts are to review *de novo* the ultimate questions of reasonable suspicion and probable cause. *Id.* at —, 116 S.Ct. at 1663. Since *Ornelas*, we have followed that reasoning by requiring independent review of the district court's determination of whether the interrogation was custodial, *see United States v. Yusuff*, 96 F.3d 982, 988 (7th Cir. 1996), *cert. denied*, — U.S. —, 117 S.Ct. 999, 136 L.Ed.2d 878 (1997), whether the confession was voluntary, *see United States v. D.F.*, 115 F.3d 413 (7th Cir.1997), and whether the *Miranda* waiver was voluntary, *see United States v. Mills*, 122 F.3d 346 (7th Cir.1997). However, our review of the district court's findings of historical fact is deferential; absent clear error, we shall not reverse those findings. We now turn to Mr. Westbrook's claims concerning the pre-*Miranda* oral statements and then to the post-*Miranda* written statement.

back to the car and waited for Dean. Mrs. Westbrook, in the car, noticed the police watching them. When Dean came to the car, Mr. Westbrook told him that, if he had crack on him, he couldn't get in the car, because the police might

### 1. Custodial Interrogation: Pre-*Miranda* Statements

When Mr. Westbrook made his oral statements at the Red Roof Inn, he was in custody but had not been advised of his *Miranda* rights. On this point, there is no disagreement. Mr. Westbrook contended that the questions put to him without *Miranda* warnings amounted to unlawful custodial interrogation.

The district court did not agree. The court concluded first that the defendant had volunteered the incriminating statements and had not been under a compelling influence to incriminate himself. It reached this determination because it found Mr. Westbrook's testimony concerning coercive police conduct to be uncorroborated and incredible:

> Westbrook testified that he was arrested at gunpoint by fifteen officers. He claimed that the police probed for information and encouraged him to talk. Finally, he claimed that while he was sitting in the police car at the Red Roof Inn, on[e] of the officers waved the bag of drugs in his face and asked if it looked familiar. These claims are not corroborated and do not mesh with the other testimony.

R.53 at 7. The court also determined that the police did not subject Mr. Westbrook to interrogation or its functional equivalent. This conclusion was based on the court's factual finding that the police followed their ordinary preinterrogation procedure when they brought Mr. Westbrook back to the motel:

> [T]hey did not ask any questions of him; they did nothing designed to induce Westbrook to talk. The testimony at the hearing indicated that all the officers did was stand around waiting for Special Agent O'Neal to arrive and respond to Mr. Westbrook's persistent inquiries.

*Id.* at 6–7. Based on these conclusions, the court denied Mr. Westbrook's motion to suppress.

pull him over. So Dean went around to the other side of the motel. Mr. Westbrook admitted he knew Dean was burying the crack, but insists he never touched it. He denies that he ever sold drugs for Dean or cooked crack.

### a.

On appeal Mr. Westbrook submits that the district court erred in stating that the police did not ask him any questions. He contends that two questions were asked of him. The first came from Trooper Carnduff, who asked Mr. Westbrook the identity of the other person who was with the Westbrooks earlier that day. When Mr. Westbrook answered that he did not know who the other person was, the questioning ended. The second question came from an officer who walked by the window of the squad car in which Mr. Westbrook was being held; according to the defendant, the officer showed him the bag of drugs that had been uncovered, and asked: "Does this look familiar?" Mr. Westbrook testified that he began "screaming and yelling telling them I ain't never seen that before in my life, man." R.52 at 8. The defendant contends that these questions, asked without *Miranda* warnings while he was in custody, constituted custodial interrogation clearly intended to elicit a statement from him. He also asserts that the acts of transporting him back to the motel, questioning him and showing him the crack cocaine were coercive tactics that frightened him and succeeded in eliciting statements from him. The government responds that Mr. Westbrook initiated all of the conversations with the police and that his voluntarily made statements were not given in violation of *Miranda*.

### b.

 *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires that, before a defendant is subjected to custodial interrogation, he must be told of his right to remain silent, his right to an attorney, and the possible use of any statement he makes as evidence against him. *Id.* at 444, 86 S.Ct. at 1612. In *Miranda*, the Court defined custodial interrogation as "questioning *initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612 (emphasis added). In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court re-turned to the concept of "custodial interrogation": "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Id.* at 300–01, 100 S.Ct. at 1689. The Court in *Innis* defined "interrogation" more expansively to mean "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1689. However, volunteered statements are not subject to *Miranda* warnings. 384 U.S. at 478, 86 S.Ct. at 1630; *see Innis*, 446 U.S. at 299–300, 100 S.Ct. at 1689; *McGowan v. Miller*, 109 F.3d 1168, 1175 (7th Cir.1997). Following *Innis* and the law of our circuit, we consider whether a reasonable objective observer would have believed that the two questions claimed by Mr. Westbrook to have been unlawful interrogation were in fact "reasonably likely to elicit" an incriminating response. *Enoch v. Gramley*, 70 F.3d 1490, 1499 (7th Cir.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 95, 136 L.Ed.2d 50 (1996); *Killebrew v. Endicott*, 992 F.2d 660, 663 (7th Cir.1993) (citing *Innis*, 446 U.S. at 301, 100 S.Ct. at 1690).

### c.

 The first question was Trooper Carnduff's query whether Mr. Westbrook "knew who the third subject was that was with him earlier." R.52 at 74. There is no dispute as to whether this question was asked. Trooper Carnduff admitted in his testimony that it was asked. Yet, in its disposition of the suppression motion, the district court stated that the troopers "did not ask any questions of him." R.53 at 7. This conclusion is clear error because the transcript simply will not support such a broad assertion.

We begin our evaluation of the contention by placing the remark in context. When the Westbrooks and Trooper Carnduff were at the car dealership lot discussing the Westbrooks' uninsured, unregistered car, Mr. Westbrook told Trooper Carnduff that the friend who had been in the car with them had gone back to the motel to get his driver's license so that he could drive the West-

brooks' car. That statement was made before the crack cocaine was found at the motel and, of course, before Mr. Westbrook was arrested. Trooper Carnduff's inquiry as to the identity of the friend was made later, when Mr. Westbrook was sitting in the trooper's squad car at the motel. At that point, Mr. Westbrook was under arrest and handcuffed.

In its brief to this court, the government omits any substantive comment on Trooper Carnduff's question and Mr. Westbrook's reply that he did not know the identity of the individual. In other cases, we have held that brief informational questions that are not designed to elicit incriminating statements can be proper. We have tolerated inquiries such as the identity of others present in a room at the time the suspect is arrested. *See United States v. Guiterrez,* 92 F.3d 468, 471 (7th Cir.1996). We also have permitted pre-*Miranda* questioning about a defendant's identity and residence because the question, in that context, was not one that would be perceived as interrogation by a reasonable person in the same circumstances. *See United States v. Edwards,* 885 F.2d 377, 386 (7th Cir.1989). Similarly, we have held that an officer's question "What's this?" in the course of a pat-down search did not constitute custodial interrogation requiring *Miranda* warnings. *See United States v. Yusuff,* 96 F.3d 982, 988 (7th Cir.1996). Here, the question cannot be characterized quite so easily as a "preliminary" question not calculated to elicit an incriminating answer. Nor can it be justified as a "follow-up" question. If it had been asked earlier, before Mr. Westbrook's arrest, such a characterization might well have been justified. However, the intervening event of Mr. Westbrook's arrest changed substantially the situation. At the time he was asked for the information, Mr. Westbrook was in custody and had been told that he had been arrested for cocaine trafficking. Disclosure of the identity of his confederate was impor-

tant to the authorities in building the case against him.

■ Nevertheless, when we evaluate this case in its entirety, we believe that the admission of this statement was harmless error. *See Arizona v. Fulminante,* 499 U.S. 279, 312, 111 S.Ct. 1246, 1266, 113 L.Ed.2d 302 (1991); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Killebrew v. Endicott,* 992 F.2d 660, 663 (7th Cir.1993). As Mr. Westbrook points out, the government did refer, with some emphasis, to his denials of involvement during the period at the Red Roof Inn. This particular statement was, in that context, merely cumulative.

■ The second question unlawfully addressed to Mr. Westbrook, he claims, was whether the bag of drugs being held up for him to see "looked familiar" to him. The district court found that the encounter simply was not corroborated and was not credible in light of the other testimony. We must accept the district court's factfinding and credibility determinations and shall not overturn them unless they are clearly erroneous. *Yusuff,* 96 F.3d at 988; *see also McGowan,* 109 F.3d at 1175 (upholding trial court's finding that defendant initiated conversation with detective and that defendant's claim that he was interrogated was not truthful).

■ Moreover, our plenary review of the record leads us to agree with the district court that other statements initiated by Mr. Westbrook were voluntary and that the police conduct did not amount to interrogation.[6] Mr. Westbrook himself testified that he initiated unsolicited comments and questions to the officers. Westbrook continued to make statements even after the police, who were conducting their investigation at the Red Roof Inn, advised him to hold his comments until an investigator arrived. The conduct of the officers was neither coercive nor likely to evoke an incriminating response.

---

**6.** *See Enoch,* 70 F.3d at 1500 (concluding that an officer's identifying of the victim to the suspect and briefly stating the evidence against him was not the functional equivalent of interrogation); *Cooper,* 19 F.3d at 1162 (noting that "which party encouraged the dialogue between the po-

lice and the accused plays an indicative role in the determination of whether the statement was the result of compelled influence"); *Killebrew,* 992 F.2d at 663 (concluding that Killebrew did not volunteer his incriminating statement but that the error was harmless).

### 2. Custodial Interrogation: Post–*Miranda* Statement

#### a.

■ At police headquarters Mr. Westbrook was interrogated by Special Agent O'Neal. Mr. Westbrook asserts that he was never advised of his *Miranda* rights. Instead, he submits, he was told to initial some papers handed to him by Agent O'Neal. The papers he initialed and signed were a waiver of his rights. He then provided a written statement to Agent O'Neal. Mr. Westbrook contends that, even though he signed the waiver of his rights, he did so without being advised orally of the *Miranda* warnings beforehand.

Special Agent O'Neal's testimony contradicted Mr. Westbrook's. The agent testified that he followed his usual procedure when interviewing Mr. Westbrook. First he took Mr. Westbrook's personal history. He then gave Mr. Westbrook an Illinois State Police Constitutional Rights and Waiver Form containing the *Miranda* admonishment. After explaining the procedure he would follow, Agent O'Neal read each *Miranda* right statement from the form, asked Mr. Westbrook if he understood, and then asked him to initial the form beside each statement. After reading him all the *Miranda* rights, he asked whether Mr. Westbrook would give a written statement. Mr. Westbrook agreed; he signed the waiver and proceeded to write a statement.

The district court found Agent O'Neal's testimony "by far more credible than Westbrook's." R.53 at 7. The court believed that the officer read the *Miranda* warnings to Mr. Westbrook before interrogating him or taking his written statement. The district court's finding that the agent's testimony was more credible than the defendant's was not clearly erroneous. *See United States v. Na-*varro, 90 F.3d 1245, 1258 (7th Cir.1996) (affirming district court's historical finding that the officer's testimony was more credible than the defendant's, concluding that *Miranda* rights were in fact read to defendant).

#### b.

Mr. Westbrook also claims that his written statement was coerced by the conduct of Agent Fisher. The ultimate determination of the voluntariness of a confession we review de novo. *United States v. D.F.*, 115 F.3d 413, 419 (7th Cir.1997). We accept the district court's findings of fact unless they are clearly erroneous. *Id.*

At the suppression hearing, the defendant testified that Agent Fisher came into the interview room, shook a bag of marijuana at Mr. Westbrook and said, "Look what I found." R.52 at 13. Mr. Westbrook stated that he figured the marijuana came from his wife. According to Mr. Westbrook, Agent Fisher told him that, if he helped them find Kevin Dean, the police would not mention the marijuana; "and so [he] made a statement for Officer O'Neal." *Id.* at 13–14. Mr. Westbrook now contends that, under these circumstances, the statement attributed to him was the product of coercion and should not have been admitted.

It is undisputed that Agent Fisher transferred Mrs. Westbrook's marijuana to Special Agent O'Neal and advised her that her possession of that marijuana would be weighed along with any cooperation her husband would give.[7] Agent O'Neal testified that Agent Fisher came into the interview room and showed a bag of marijuana to Agent O'Neal and Mr. Westbrook. However, he denied that either he or Agent Fisher told Mr. Westbrook that, if he cooperated, the police would say nothing about the marijuana.[8]

---

**7.** Agent Fisher's report of his interview with Sonya Westbrook states that Mrs. Westbrook voluntarily turned over a plastic bag of cannabis and that Agent Fisher transferred the bag to Special Agent O'Neal. The report continues:

The agents advised Westbrook that it was unknown at this time what the disposition or outcome would be concerning the cannabis that was in Sonya Westbrook's possession. It was explained to Westbrook that depending on the level of cooperation received from her husband, Charles, in locating Kevin Dean for the Illinois State Police, her case would be evaluated by the State's Attorney's office.
R.52, Def. Ex.1.

**8.** The government argues in its brief that the agents did not know the identity of the other suspect who had been at the motel until Mr. Westbrook identified him as "Kevin Dean" dur-

The government urges us to consider the issue one of credibility, resolved by the district court's explicit finding that the testimony of Agent O'Neal was "by far more credible than Westbrook's." R.53 at 7. However, the district court's credibility determination concerned its assessment of the presentation of *Miranda* warnings, not of the voluntariness of Mr. Westbrook's subsequent written statement. The court did not make a specific finding concerning the coercive nature of Agent Fisher's conduct or its possible effect on Mr. Westbrook's post-*Miranda* statement. We are quite willing to defer to the credibility assessments of the district court that saw the witnesses and heard their testimony, *see Navarro*, 90 F.3d at 1258; *United States v. Montgomery*, 14 F.3d 1189, 1194 (7th Cir.1994), as long as those findings are related to the particular issue on appeal.

■■■ However, there is a good reason for the district court's lack of findings on this issue. Mr. Westbrook failed to raise the issue of Agent Fisher's conduct in his motion to suppress or supporting filings. Mr. Westbrook testified about those events for the first time at the suppression hearing; at the end of the hearing, his counsel proffered Agent Fisher's investigative report of Sonya Westbrook's interview. Usually a defendant's failure to raise an argument before the district court waives the issue on appeal. However, because the government did not raise the defense of waiver, it has waived the waiver and we shall address the issue. *See United States v. Cichon*, 48 F.3d 269, 275 (7th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 908, 133 L.Ed.2d 840 (1996); *Garlington v. O'Leary*, 879 F.2d 277, 282–83 (7th Cir.1989).

■■■ It is clear to us that, even if we assume that Agent Fisher conducted himself as Mr. Westbrook claimed he did, the agent's actions were not coercive. We believe the officer's first announcement as he entered the room, "Look what I found," was neither an interrogation nor the functional equivalent of an interrogation. The officer should not have known that it was reasonably likely to elicit an incriminating response from the suspect. *See Innis*, 446 U.S. at 301, 100 S.Ct. at 1690; *cf. United States v. Taylor*, 985 F.2d 3, 6–7 (1st Cir.) (concluding that officer's statement "You can't be growing dope on your property like that" was spontaneous and noncoercive), *cert. denied*, 508 U.S. 944, 113 S.Ct. 2426, 124 L.Ed.2d 647 (1993). In fact, Mr. Westbrook does not claim that it caused him to respond. Instead, he submits that he gave his written statement because the agent "told me that upon my cooperation with them finding Kevin Dean that they wouldn't say nothing about the marijuana." R.52 at 14. Agent O'Neal denies the statement was made, but we know through Agent Fisher's report that Mrs. Westbrook was told that her case would be evaluated by the state prosecutor "depending on the level of cooperation received from her husband, Charles, in locating Kevin Dean." *Id.* Def. Ex.1. Upon reflection, we conclude that neither version of Agent Fisher's statement was coercive.

■■■ It is not improperly coercive conduct for an officer to tell a suspect that the prosecutor will be informed of his cooperation and will evaluate his case in light of his cooperation. *United States v. Rutledge*, 900 F.2d 1127, 1130–31 (7th Cir.) ("Government is not forbidden to 'buy' information with honest promises of consideration."), *cert. denied*, 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990). An officer's statement or promise to a defendant that the prosecutor would be told of the defendant's cooperation does not transform a defendant's otherwise voluntary statement into an involuntary one.[9] "The police are allowed to play on a

---

ing his interview. For that reason, insists the government, neither agent could have asked Mr. Westbrook to "cooperate about Kevin Dean" until *after* Mr. Westbrook had already agreed to give a statement and had, in fact, identified Dean in the statement. Gov't Br. at 19. This argument cannot stand in light of Agent Fisher's report, which states that Mrs. Westbrook told the agent that her husband was going to the Red Roof Inn to meet with Kevin Dean.

9. *United States v. Harris*, 914 F.2d 927, 933 (7th Cir.1990) (officers may solicit confessions by offer of reduced charges); *United States v. Rodgers*, 755 F.2d 533, 546 (7th Cir.) (promise to notify prosecutor if defendant cooperated does not render defendant's statement involuntary), *cert. denied*, 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985).

suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible." *Rutledge*, 900 F.2d at 1131 (concluding that the statement "all cooperation is helpful" is not improper inducement).

In this case, if we assume Mr. Westbrook's version of the facts, the agent presented Mr. Westbrook with the reality that his wife had marijuana in her purse and made him an offer: If he would cooperate by helping the police find Dean, that cooperation would be helpful. According to Agent Fisher's report, it would be helpful because the state prosecutor would take it into consideration when evaluating Mrs. Westbrook's case. According to Mr. Westbrook's claim, it would be helpful because there would be no mention of the marijuana.[10] Mr. Westbrook does not contend that the marijuana was mentioned as a factor in later legal proceedings; therefore we have no reason to believe a false promise was made. *See Sprosty v. Buchler*, 79 F.3d 635, 646 (7th Cir.) (stating that "the state is not prohibited from inducing a confession with an honest promise of leniency"), *cert. denied,* — U.S. —, 117 S.Ct. 150, 136 L.Ed.2d 95 (1996). Indeed, nothing in this record leads us to believe the agents misled him or exploited Mr. Westbrook's anxiety to the point that he was unable to make a rational decision about whether to confess. See *id.* at 647; *Rutledge*, 900 F.2d at 1131. Nor do we believe that the agent placed undue psychological coercion on Mr. Westbrook by suggesting that it would be to his wife's benefit, rather than (or as well as) to his own benefit, to cooperate. It is clear to us that Agent Fisher was inviting Mr. Westbrook to cooperate and nothing more. The agent's statement pointed out the desirability of cooperation and did not misrepresent the government's intention or purpose. The record reflects that, after hearing this comment simply urging him to cooperate with the police, Mr. Westbrook made a voluntary, common-sense decision to cooperate. Finally, we

believe the agent's showing of the bag of marijuana, along with discussion about cooperation, was not unduly coercive. *See United States v. Toro–Pelaez*, 107 F.3d 819, 826 (10th Cir.) ("That the troopers showed [the defendant] the cocaine and pointed out the possible consequences if convicted in an effort to elicit cooperation does not compel a finding of coercion."), *pet'n for cert. filed,* 66 U.S.L.W. 3257 (U.S. May 22, 1997) (No. 96–9380).

In sum, we conclude that Agent Fisher's actions were not unconstitutionally coercive. We also have examined the totality of the circumstances surrounding Mr. Westbrook's statement—including the conditions of the interrogation and detention, the conduct of other officers, the age and characteristics of the suspect and his susceptibility to coercive tactics. We hold that, on this record, Mr. Westbrook was not compelled to make a statement that was not a product of a free intellect. Having concluded that Mr. Westbrook voluntarily made his written statement after *Miranda* warnings were properly given and properly waived, we hold that the district court did not err when it denied the motion to suppress.

### B. *Exclusion of Evidence*

■ Mr. Westbrook submits that the district court erred in disallowing testimony from Charles Dean and Special Agent O'Neal about Dean's affiliation with the Gangster Disciples gang. He asserts first that the testimony was relevant to defend his credibility and to explain his fear of reprisal. He testified he misidentified Charles Dean as "Kevin Dean" because he did not want to put his wife and her children in danger. He contends now that evidence about the Gangster Disciples would certainly be material to the reasonableness of his fear of gang reprisals. Mr. Westbrook also claims that the real conspiracy in this case was not between Dean and himself but between Dean and gang members who were trying to bring drugs into Springfield and who conspired to

---

**10.** Mr. Westbrook certainly has not claimed that he was coerced into speaking by some threat of harm to his wife. These circumstances are in no way similar to *Harris v. South Carolina,* 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949), in which the defendant was threatened that his mother would be arrested unless he agreed to confess.

use Westbrook as a "fall guy." Relying on *United States v. Thomas,* 86 F.3d 647 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 392, 136 L.Ed.2d 307 (1996), Mr. Westbrook asserts that he should have been allowed to pursue the relationship between Westbrook on one hand and Dean and the other government witnesses on the other. The court's determination that evidence of gang affiliation was irrelevant was, insists Mr. Westbrook, a prejudicial error of law.

The government responds that there was no evidence that anyone was a member of a gang. According to the government, Mr. Westbrook prior to trial never advised any of the agents that he feared for his or his wife's safety or even that Dean was a member of the Gangster Disciples. There was no evidence of threats made to the Westbrooks; in fact, Mr. Westbrook testified that he went with his wife and her children to see Dean on January 30, 1995, after the Westbrooks' release by the agents. In addition, the government notes, Mr. Westbrook challenged Dean's credibility at length on cross-examination. The jury was fully apprised of facts from which to assess Dean's version of events.

■■■■ The admission of gang affiliation evidence at trial is generally governed under Rules 401 and 403 of the Federal Rules of Evidence.[11] We review a district court's ruling concerning the admissibility of evidence of gang membership for a clear abuse of discretion. *United States v. Sargent,* 98 F.3d 325, 328 (7th Cir.1996); *United States v. Irvin,* 87 F.3d 860, 863 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 259, 136 L.Ed.2d 184 (1996). Evidence of gang affiliation is admissible in cases in which it is relevant to demonstrate the existence of a joint venture or conspiracy and a relationship among its members. *Thomas,* 86 F.3d at 652; *United States v. Lewis,* 910 F.2d 1367,

1372 (7th Cir.1990). We are fully cognizant of the powerful nature of such evidence; when introduced by the government against a criminal defendant, it can taint a defendant in the eyes of the jury and also can establish criminal intent or agreement to conspire. *Sargent,* 98 F.3d at 328 (collecting cases). For this reason, in our review we examine the care and thoroughness with which a district judge considered the admission or exclusion of gang-involvement evidence. *See United States v. Butler,* 71 F.3d 243, 251 (7th Cir.1995) (stating that this court demands careful consideration by district judges in determining admissibility of gang evidence).

This case is unusual. Typically the defendant claims that the prejudicial effect of the evidence substantially outweighs its probative value.[12] In this case, however, the defendant objects to the exclusion of such evidence because he believes it would substantiate his claim that he feared reprisal.

■■■ Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. "Evidence which is not relevant is not admissible." Fed.R.Evid. 402. One measure of the relevance of evidence is whether " 'its exclusion would leave a chronological and conceptual void in the story.' " *Wilson v. Groaning,* 25 F.3d 581, 584 (7th Cir.1994) (quoting *United States v. Vretta,* 790 F.2d 651, 655 (7th Cir.), *cert. denied,* 479 U.S. 851, 107 S.Ct. 179, 93 L.Ed.2d 115 (1986)). On the other hand, evidence is not relevant if there is no connection between the evidence and the issues of the case or material facts at issue. *See United States v. Mazzanti,* 888 F.2d 1165, 1169 (7th Cir.1989), *cert. denied,* 495 U.S. 930, 110 S.Ct. 2167, 109 L.Ed.2d 497 (1990); *see also United States v. Rubio–Topete,* 999 F.2d 1334, 1339 (9th Cir.

---

11. Rule 401 states:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Rule 403 provides: Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

Fed.R.Evid. 401, 403.

12. *See, e.g., Sargent,* 98 F.3d at 328 (holding that no abuse of discretion occurred when court admitted evidence of gang membership as explanatory evidence); *Irvin,* 87 F.3d at 864–66 (concluding that the district court abused discretion in not excluding the gang affiliation evidence).

1993); *United States v. Smith,* 918 F.2d 1032, 1038 (2d Cir.1990), *cert. denied,* 498 U.S. 1125, 111 S.Ct. 1086, 112 L.Ed.2d 1191 (1991).

Following our review of the record, we are confident that the district court did not abuse its discretion in its handling of gang membership evidence in this case. Mr. Westbrook was permitted to testify, over objection, that he knew Charles Dean was affiliated with the Gangster Disciples gang and that the gang's members were dangerous. In fact, he further explained that he had known Dean from East St. Louis, had seen him using the Gangster Disciple handshake (which Mr. Westbrook then demonstrated), and knew Dean had a Gangster Disciples tattoo. Although Agent O'Neal later testified on rebuttal that Dean did not have any tattoos, the evidence of Dean's gang affiliation was before the jury. Mr. Westbrook also testified that he was afraid of Dean and concerned that he might put his wife and her kids in jeopardy. This testimony allowed the defendant to put to the jury his fear-of-reprisal theory of defense.

However, the court properly sustained objections to Mr. Westbrook's questions about the possible gang affiliation of Harold Lacy and Hernando Wilson, two men not called to testify and not even involved in the events surrounding Mr. Westbrook's arrest and indictment. The court also refused to permit Agent O'Neal to present general information about the Gangster Disciples. As the court explained on the record, after a side bar:

> First thing is that [defense counsel] wanted to recall Special Agent O'Neal for the limited purpose of inquiring about the Gangster Disciples. The Government objected to that as being totally irrelevant to the issues before the Court in this case and in this prosecution. I agreed with the government that it was not an issue and it was not an element, and therefore I allowed the objection, and Agent O'Neal was

> not recalled by [defense counsel] for that purpose.

R.76 at 494–95.

We believe that the trial court, in its discretion, properly limited the admission of evidence in this case. Mr. Westbrook's testimony about Dean's gang affiliation was the only evidence of gang membership in the trial; Mr. Westbrook did not examine other witnesses to establish their gang affiliation or their relationship with Dean as anything other than relative or friend. There was no evidence that Dean had reason to conspire with other witnesses to testify falsely against Mr. Westbrook. Finally, no relationship or connection was drawn between the material facts at issue at trial, namely the evidence of conspiracy to distribute crack cocaine on January 30, 1995, and affiliation with the Gangster Disciples. No foundation was laid, no proffer was made to establish the relevance of such evidence. *See Mazzanti,* 888 F.2d at 1169–70 (concluding that defendant's failure to proffer evidence connecting gang operation to the cocaine transactions at issue in that case led to proper exclusion of gang evidence on relevancy grounds). We thus conclude that the trial court in this case properly acted within its discretion in excluding, on relevance grounds, testimony concerning gang affiliation.

C. *The Constitutionality of Federal Crack Cocaine Laws*

1.

■ Mr. Westbrook raises a constitutional challenge to 21 U.S.C. § 841(a)(1) for offenses involving crack cocaine and to the mandatory penalties of § 841(b).[13] Relying on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), he first claims that Congress lacks the authority to enact federal laws concerning crack cocaine because the manufacture of crack is a local activity, one that has nothing to do with interstate commerce. We review de novo his challenge to the constitutionality of this pro-

---

**13.** Title 21 U.S.C. § 841(b)(1)(A) provides the statutory penalties for cocaine offenses. It establishes that 1 gram of cocaine base is treated the same as 100 grams of cocaine when the level of sentence is determined. Section 2D1.1(c) of the United States Sentencing Guidelines, the Drug Quantity Table, provides the penalties for the guidelines for crack offenses. It incorporates the 100-to-1 penalty ratio found in 21 U.S.C. § 841.

vision. *See United States v. Turner*, 93 F.3d 276, 286 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 596, 136 L.Ed.2d 524 (1996).

In *Lopez*, the Supreme Court held that Congress had exceeded its power under the Commerce Clause when it enacted the Gun–Free School Zones Act of 1990. The Court struck down the act as unconstitutional on the ground that it was "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise." 514 U.S. at 561, 115 S.Ct. at 1630–31. In this circuit, we recently distinguished *Lopez* from cases involving drug offenses: "Unlike possession of firearms, which the Gun–Free School Zones Act proscribed, drug dealing is an economic activity that affects interstate commerce." *United States v. Rogers*, 89 F.3d 1326, 1338 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S. Ct. 495, 136 L.Ed.2d 387 (1996). We concluded that the defendant's convictions for various drug-related activities were not constitutionally invalid, given Congress' broad authority to regulate drug-related activity. *Id.* In *United States v. Stowe*, 100 F.3d 494 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997), we also rejected the claim that Congress exceeded its authority under the Commerce Clause when it created the sentencing penalty for crack cocaine. *Id.* at 501 (noting that "local distribution of cocaine-based drugs, such as the crack in this case, [is] part of a long and continuous chain of international and interstate commerce" and that "[l]ocal participation in the international and interstate drug trade bears [a substantial] relation [to interstate commerce]") (quoting *Lopez*, 514 U.S. at 559, 115 S.ct. at 1630).

It is clear to us that Congress validly exercised its authority under the Commerce Clause when it enacted the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.*, which includes the cocaine distribution conspiracy statute, 21 U.S.C. § 846, under which Mr. Westbrook was convicted. *See* 21 U.S.C. § 801(3)–(6) (Congressional declaration that local narcotics activities have a substantial effect on interstate commerce).[14] We held before *Lopez* that the Controlled Substances Act was a permissible exercise of the Congress' power under the Commerce Clause to regulate and penalize intrastate drug trafficking activities. *See United States v. Esposito*, 492 F.2d 6, 10 (7th Cir.1973), *cert. denied*, 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 760 (1974). Like the District of Columbia Circuit, we believe that *Lopez* does not affect that holding. *See United States v. Edwards*, 98 F.3d 1364, 1369 (D.C.Cir.1996) (noting that the Drug Act, in contrast with the Gun–Free School Zones Act, "includes specific findings that intrastate drug activity has a substantial effect on interstate drug activities and that effective control of drug activities occurring intrastate requires both interstate and intrastate regulation"), *cert. denied*, —— U.S. ——, 117 S.Ct. 1437, 137 L.Ed.2d 544 (1997). We join the other circuits that uniformly have held, after *Lopez*, that it was within the authority of the Congress under the Commerce Clause to create drug laws criminalizing narcotics transactions such as those found under 21 U.S.C. §§ 846 and 841.[15] We hold that 21 U.S.C. §§ 841 and

---

**14.** In the Introductory Provisions of the Controlled Substances Act, the Congress made certain findings and declarations. They include the following:

> (3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce....
>
> (4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.
>
> (5) Controlled substances manufactured and distributed intrastate cannot be differentiated

> from controlled substances manufactured and distributed interstate....
>
> (6) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic.
>
> 21 U.S.C. § 801.

**15.** *See, e.g., Proyect v. United States*, 101 F.3d 11, 11 (2d Cir.1996) (per curiam) (holding that 21 U.S.C. § 841 represents a valid exercise of the commerce power) (collecting cases); *United States v. Zorrilla*, 93 F.3d 7, 8 (1st Cir.1996) (listing cases that hold that "drug trafficking is precisely the kind of economic enterprise that substantially affects interstate commerce and that, therefore, comes within Congress's regulatory power under the Commerce Clause"); *Unit-*

846, under which Mr. Westbrook was convicted, pass constitutional muster.

### 2.

Mr. Westbrook also asserts that the law governing crack, which establishes a 100-to-1 disparity between crack and powder cocaine, is unconstitutional on its face and as applied. In light of the fact that every constitutional challenge to the penalty differential found in 21 U.S.C. § 841 and § 2D1.1(c) of the Sentencing Guidelines has failed, this argument cannot succeed. Since our first consideration of the issue in *United States v. Lawrence,* 951 F.2d 751, 753–56 (7th Cir. 1991), this court has consistently held that the disparity of the penalty structure imposed by the Guidelines between cocaine base and cocaine powder is constitutional.[16] We shall not overrule existing precedent.

### 3.

Finally, Mr. Westbrook asserts that the federal crack cocaine laws usurp the states' traditional police powers under the Tenth Amendment. As we recognized in *United States v. Kenney,* 91 F.3d 884, 891 (7th Cir.1996), however, the Congress may regulate conduct that a state may also regulate. When the law or regulation in question is a proper exercise of congressional power under the Commerce Clause and does not require state action, the statute does not violate the Tenth Amendment. Id. (holding that 18 U.S.C. § 922(*o*) does not violate the Tenth Amendment). The same argument has been made in the context of 21 U.S.C. §§ 841 and 846 as well. *See United States v. Lerebours,* 87 F.3d 582, 585 (1st Cir.1996) (holding that "courts will not strike down a statute under the Tenth Amendment where Congress was within its powers under the Commerce Clause to enact the statute") (cit-

ing *United States v. Owens,* 996 F.2d 59, 60–61 (5th Cir.1993)), *cert. denied,* —— U.S. ——, 117 S.Ct. 694, 136 L.Ed.2d 617 (1997). We conclude that the federal statutes criminalizing conduct involving narcotics trafficking, such as the conspiracy to distribute crack at issue here, are constitutional as a proper exercise of Congress' powers under the Commerce Clause.

### Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

---

ed *States v. Lerebours,* 87 F.3d 582, 584–85 (1st Cir.1996) (holding that Congress had the authority under the Commerce Clause to criminalize the conduct under §§ 841 and 846), *cert. denied,* —— U.S. ——, 117 S.Ct. 694, 136 L.Ed.2d 617 (1997); *United States v. Genao,* 79 F.3d 1333, 1335 (2d Cir.1996) (finding 21 U.S.C. § 846 constitutional under *Lopez*).

**16.** *See, e.g., United States v. Thomas,* 86 F.3d 647, 655 (7th Cir.1996); *United States v. Booker,* 73

F.3d 706, 710 (7th Cir.1996) (per curiam) (holding that the cocaine base/cocaine powder disparity does not violate the equal protection clause) (collecting cases); *United States v. Jones,* 54 F.3d 1285, 1294 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 263, 133 L.Ed.2d 186 (1995); *United States v. Blanding,* 53 F.3d 773, 776 (7th Cir. 1995); *United States v. Chandler,* 996 F.2d 917, 918–19 (7th Cir.1993) (per curiam).