**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**D.F., Defendant–Appellee.**

No. 94–2900.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 11, 1996.

Decided May 12, 1997.*

---

* This opinion is being released initially in typescript form.

Stephen A. Ingraham, argued, Office of the United States Attorney, Milwaukee, WI for Plaintiff-Appellant.

Dean A. Strang, argued, Fitzgerald & Strang, Milwaukee, WI, for Defendant-Appellee.

Before RIPPLE and ROVNER, Circuit Judges, and MILLER, District Judge.**

RIPPLE, Circuit Judge.

This case is before the court on remand from the Supreme Court of the United States. In our earlier opinion, *United States v. D.F.*, 63 F.3d 671 (7th Cir.1995) ("D.F.–I"), *vacated*, —— U.S. ——, 116 S.Ct. 1872, 135 L.Ed.2d 169 (1996), we affirmed the judgment of the district court suppressing certain statements of the defendant. The district court had ruled that those statements had been coerced in violation of the Fifth Amendment of the Constitution of the United States. After considering the petition for writ of certiorari filed by the Government, the Supreme Court directed that we reconsider our earlier decision in light of its intervening holding in *Ornelas v. United States*, —— U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

Upon receiving the direction of the Supreme Court, we considered the statements of the parties filed pursuant to Circuit Rule 54. Because of the importance of the question, we also set the case for reargument and heard the helpful arguments of counsel for both parties. We shall assume familiarity with our earlier opinion and proceed directly to the task assigned us by the Supreme Court. First we shall discuss the Supreme Court's holding in *Ornelas*. Then we shall examine the precedent of this circuit governing the standard of review in assessing the voluntariness of a confession. On the basis of that analysis, we shall then determine whether the Supreme Court's decision requires an adjustment in the governing law of this circuit. At that point, we shall turn to the facts of the case before us.

## I

### A.

■ In *Ornelas,* the Supreme Court addressed the appropriate standard of appellate review for the "reasonable suspicion" and "probable cause" standards employed in determining the legality of searches and seizures under the Fourth Amendment. The Court began its analysis by noting that both of these standards are "commonsense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* at ——, 116 S.Ct. at 1661 (quoting *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983) (quoting in turn *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949))). Standards of this sort, continued the Court, cannot be reduced to a neat set of legal rules or be considered "finely-tuned standards." *Id.* They are fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed. *Id.*

Nevertheless, the Supreme Court held that this court had erred in applying a deferential standard of review to the ultimate question of whether these standards had been met. Rather, held the Supreme Court, the analytical steps necessary in evaluating the ultimate judicial decision as to the existence of probable cause or reasonable suspicion must be unbundled. "The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Id.* at —— – ——, 116 S.Ct. at 1661–62. The first part of such an analysis, noted the Court, involves only a determination of historical facts, but the second is a mixed question of law and fact:

> [T]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it in another way, whether the rule of law as applied to the established facts is or is not violated.

—— U.S. at ——, 116 S.Ct. at 1662 (quoting *Pullman–Standard v. Swint,* 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790 n. 19, 72 L.Ed.2d 66 (1982)).

In short, although holding that a deferential standard of review was appropriate with respect to the trial court's determination of the underlying historical facts, the Supreme Court held that the ultimate question of whether those facts satisfy the relevant standard was a mixed question of fact and law that ought to be subject to independent appellate review. The Court noted that this approach was consistent with its earlier precedent and that "[a] policy of sweeping deference would permit, '[i]n the absence of any significant difference in the facts,' the Fourth Amendment's incidence [to] tur[n] on whether different trial judges draw general conclusions that the facts are sufficient or insufficient to constitute probable cause." *Id.* (quoting *Brinegar,* 338 U.S. at 171, 69 S.Ct. at 1308–09). Such varied results, continued the Supreme Court, "would be inconsistent with the idea of a unitary system of law." *Id.* Moreover, because "the legal rules for probable cause and reasonable suspicion acquire content only through application," independent review is "necessary if appellate courts are to maintain control of, and to clarify, legal principles."[1] *Id.* De novo review, continued the Court, "tends to unify the precedent" and "provid[es] law enforcement officers with a defined set of rules which, in

---

1. Notably, the Court cited for this proposition its holding in *Miller v. Fenton,* 474 U.S. 104, 114, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985). In that case, the Court held that a state trial court's determination that a confession was voluntary—the ultimate issue before us in this case—ought not be reviewed deferentially by a federal habeas court. In *Ornelas,* the Court noted that, in *Miller,* it had written that when the

"relevant legal principle can be given meaning only through its application to the particular circumstances of a case, the Court has been reluctant to give the trier of fact's conclusions presumptive force and, in so doing, strip a federal appellate court of its primary function as an expositor of law." *Ornelas,* —— U.S. at ——, 116 S.Ct. at 1662 (quoting *Miller,* 474 U.S. at 114, 106 S.Ct. at 451–52).

most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement." *Id.* (internal quotations and citations omitted).

The Court acknowledged that, "because the mosaic which is analyzed for a reasonable-suspicion or probable-cause inquiry is multi-faceted, 'one determination will seldom be useful "precedent" for another.' " *Id.* (quoting *Gates,* 462 U.S. at 238 n. 11, 103 S.Ct. at 2332 n. 11). Nevertheless, it continued, similar factual circumstances in other cases are indeed a very helpful guide in determining whether reasonable cause or reasonable suspicion or probable cause existed. " [E]ven where one case may not squarely control another one, the two decisions when viewed together may usefully add to the body of law on the subject." *Id.* at ——, 116 S.Ct. at 1663.

Because of these considerations of uniformity of decision, and of the predictability and ease of administration that would follow from such uniformity of decision, the Court concluded that the ultimate determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal. It emphasized, however, that a reviewing court should "take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* In this regard, the Court noted that a "trial judge views the facts of a particular case in light of the distinctive features and events of the community" in which that judge sits. *Id.* A police officer also views the facts of a case through the lens of his police experience and expertise. An appeals court, emphasized the Supreme Court, "should give due weight to a trial court's finding that an officer was credible and the inference was reasonable." *Id.*

### B.

Writing before the Supreme Court's decision in *Ornelas,* this court had held in *United States v. Baldwin,* 60 F.3d 363 (7th Cir.1995), *vacated,* —— U.S. ——, 116 S.Ct. 1873, 135 L.Ed.2d 169 (1996), that an appellate court ought to assess the voluntariness of a confession under the deferential abuse of discretion standard. Noting that its holding was motivated in substantial part by decisions of the Supreme Court that had employed a deferential standard of review with respect to mixed questions of fact and law,[2] the court observed that this circuit had "moved decisively," *id.* at 365, toward the clear error standard for the appellate review of mixed questions of fact and law.[3] In the court's view, the voluntariness of a confession posed no greater need for de novo review than the other situations governed by deferential review.

This court in *Baldwin* enumerated several reasons for the use of a deferential standard of review with respect to the voluntariness of a confession. First, it noted that the trial

**2.** The panel noted specifically *McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 356, 111 S.Ct. 807, 817–18, 112 L.Ed.2d 866 (1991) (holding that a determination of whether a person is a "member of the crew" is, when the facts are disputed, a decision for the jury and will not be disturbed if reasonable, but that whether the facts meet the legal standard of the statutory definition is a matter of law); *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 401–05, 110 S.Ct. 2447, 2458–61, 110 L.Ed.2d 359 (1990) (holding that the imposition of Rule 11 sanctions is reviewed under a deferential standard of review); and *Pierce v. Underwood,* 487 U.S. 552, 559–61, 108 S.Ct. 2541, 2547–48, 101 L.Ed.2d 490 (1988) (holding that a district court's determination under the Equal Access to Justice Act as to whether the position of the government was substantially justified is reviewed under the abuse of discretion standard).

**3.** The panel noted the following examples: *G.J. Leasing Co. v. Union Elec. Co.,* 54 F.3d 379, 381 (7th Cir.1995) (noting that a trial court's determination of negligence is reviewed for clear error); *Stevens v. United States,* 49 F.3d 331, 334 (7th Cir.1995) (holding that whether the payment of the proceeds of a sale to the Internal Revenue Service was voluntary was subject to the clearly erroneous test); *Williams v. Commissioner,* 1 F.3d 502, 505 (7th Cir.1993) (holding that when a sale takes place is subject to the clearly erroneous test); *United States v. Spears,* 965 F.2d 262, 269–71 (7th Cir.) (holding that a deferential standard of review is employed in reviewing a determination of probable cause in a warrantless search situation), *cert. denied,* 506 U.S. 989, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992); *Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d 928, 933 (7th Cir.1989) (en banc) (holding that a deferential standard is employed in reviewing the imposition of Rule 11 sanctions).

court is closer to the historical facts of the case and more practiced than appellate judges in assessing the significance of those facts. The court also believed that uniformity on such a fact-specific issue was possible only with respect to the governing legal standard. In this regard, the court perceived no difference between the fact-specific inquiry undertaken in other areas and the fact-specific inquiry with respect to the voluntariness of confessions. The court specifically relied upon its earlier holdings that issues of probable cause, waiver of Miranda rights and consent to search were all subject to a deferential standard of review in this circuit.

The advent of *Ornelas* obviously requires, as the Supreme Court has directed, a reexamination of our holding in *Baldwin*. One of the principal analogies upon which *Baldwin* relied, the determination of probable cause, is now governed, ultimately, by a de novo standard of review under the very holding of *Ornelas*. We now proceed to undertake that reassessment.

### C.

We believe that a comparison of the rationales of the Supreme Court's holding in *Ornelas* and this court's earlier holding in *Baldwin* makes clear that *Ornelas* requires a course adjustment on our part. Nevertheless, it is important to note that there is important common ground between the two decisions. The Supreme Court stressed in *Ornelas* that an appellate court ought to review deferentially the findings of the trial court with respect to the historical facts that underlie the issue of voluntariness. This court's decision in *Baldwin* correctly noted that the trial court is in a superior position to determine "who did what to whom." It has the opportunity to assess the credibility of the witnesses. Moreover, as the Supreme Court noted in *Ornelas*, the trial court will be far more cognizant of those conditions that are purely local in nature. The Court gave as an example the correlation between climatic conditions and seasonal industries. —— U.S. at ——, 116 S.Ct. at 1663.

However, we see no reason why the same familiarity would not be equally important in matters of local customs and living conditions. The Court also noted that the local trial court might be in a better position to assess with a greater degree of exactness the degree of professional proficiency of local law enforcement officers.

Beyond these historical facts, however, the Supreme Court now has made clear that some mixed questions of fact and law require a more careful appellate scrutiny than that contemplated by the deferential standard of review. It has identified two criteria by which such situations can be identified. First, the Court noted that there are some legal rules that can be given content only through application in case-specific situations. In such circumstances, opined the Court, appellate courts must exercise independent review if they are "to maintain control of, and to clarify" the controlling legal principles. *Id.* at ——, 116 S.Ct. at 1662. Second, the Court noted that there are situations in which the unification of precedent by appellate courts is especially important because it comes closer to providing law enforcement officers with a set of rules upon which they can act with the assurance that they are not going beyond the pale of the Constitution.

▮ Given these two criteria, we believe that the concept of voluntariness, as the term is used in the context of our Fifth Amendment jurisprudence, ought to be governed by the approach set forth by the Supreme Court in *Ornelas*. "Voluntariness" might be considered, at least in some legal contexts, more susceptible to common-sense definition than "probable cause" and "reasonable suspicion." [4] Nevertheless, the term is certainly given content through case-by-case adjudication, an adjudication tempered by the discipline of traditional common-law methodology. When employed as a constitutional standard of adjudication, it presents a very definite need for uniformity of meaning and consistency of application. Indeed, the Supreme Court has acknowledged this need rather

---

**4.** *Cf. Stevens v. United States,* 49 F.3d 331, 334 (7th Cir.1995) (holding that whether the payment of the proceeds of a sale to the Internal Revenue Service was voluntary was subject to the clearly erroneous test).

pointedly in *Miller v. Fenton*, 474 U.S. 104, 109–10, 106 S.Ct. 445, 448–50, 88 L.Ed.2d 405 (1985). In a prefatory analysis not uniquely tied to the specific procedural posture of the case before it,[5] Justice O'Connor, speaking for the Court, described the "voluntariness" concept of due process analysis as an attempt by the Court, through its analysis over time in the tradition of common law, to identify those situations in which a confession must be considered so "'revolting to the sense of justice'" as to be incapable of supporting a conviction. *Id.* at 109, 106 S.Ct. at 449 (quoting *Brown v. Mississippi*, 297 U.S. 278, 286, 56 S.Ct. 461, 465, 80 L.Ed. 682 (1936)). This inquiry, the Justice went on to note, has, without exception, been considered a legal question. *Id.* at 110, 106 S.Ct. at 449–50. Indeed, in an analysis repeated in *Ornelas*,[6] the Court in *Miller* noted that some legal concepts can be given content only through "application to the particular circumstances of a case," *id.* at 114, 106 S.Ct. at 451, and then went on to describe the issue of voluntariness as having "a uniquely legal dimension." *Id.* at 116, 106 S.Ct. at 452–53. That the voluntariness of a confession is analyzed under the due process guarantee, continued the Court, "reflects the Court's consistently held view that the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." *Id.* at 116, 106 S.Ct. at 452–53.

In *Ornelas*, the Court noted that its adherence to a de novo standard of review with respect to the issue of probable cause and reasonable suspicion was consistent with its earlier precedent. Notably, the Supreme Court's prior case law with respect to the voluntariness of a confession also exhibits a continuous invocation of a de novo standard of review and a reliance on the same consid-

erations that informed its decision in *Ornelas*. In *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), for example, the Court applied the same methodology it applied in *Ornelas*. Applying the "totality of the circumstances test," 499 U.S. at 285, 111 S.Ct. at 1251–52, the Court noted that it normally gave great deference to the factual findings of the state court. *Id.* at 287, 111 S.Ct. at 1252–53. Nevertheless, the Court continued, "the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination." *Id.* (quoting *Miller*, 474 U.S. at 110, 106 S.Ct. at 449–50). The Court then concluded: "Accepting the Arizona court's finding, permissible on this record, that there was a credible threat of physical violence, we agree with its conclusion that Fulminante's will was overborne in such a way as to render his confession the product of coercion." *Id.* at 288, 111 S.Ct. at 1253.

*Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), although principally focusing on another legal issue, exhibits the same methodology. In that case, the Court's principal focus was on whether police coercion was in fact an essential element or, as the Court put it, "'a necessary predicate' to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Id.* at 167, 107 S.Ct. at 522. The defendant's mental condition may be a significant factor in the voluntariness calculation, but that factor, standing alone, does not justify a conclusion of constitutional involuntariness. Having decided this point of law, however, the Court then employed a methodology compatible with the one employed in *Ornelas*. It accepted the historical facts of the case but preserved the ultimate determination of voluntariness for itself.

*Connelly* also illustrates another reason why de novo review of the ultimate issue of voluntariness is appropriate. Several aspects of the voluntariness analysis, although

---

**5.** In *Baldwin*, the panel dismissed the relevancy of *Miller* to its analysis because *Miller* involved federal review of a state conviction under 28 U.S.C. § 2254. The Supreme Court's reliance on *Miller* in *Ornelas*, see —— U.S. at ——, 116 S.Ct. at 1662, does not permit the distinction made in

*Baldwin* to stand. As we note in the text, portions of the Court's discussion in *Miller* stand quite independently from its procedural context.

**6.** *See Ornelas*, —— U.S. at ——, 116 S.Ct. at 1662.

mixed questions of fact and law, implicate very important legal standards and implicate directly the need for consistency and uniformity of application. One is the matter of causation. *Connelly* stresses that there must be an "essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." 479 U.S. at 165, 107 S.Ct. at 521. "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164, 107 S.Ct. at 519.

The other circuits traditionally have adhered to the view that, although the adjudicative facts of the case are subject to appellate review under the clearly erroneous standard, the ultimate issue of voluntariness is open to de novo review.[7] Indeed, our circuit already has suggested that the advent of *Ornelas* requires a reassessment of our jurisprudence in this area. *See United States v. Yusuff,* 96 F.3d 982, 988 (7th Cir.1996) (holding that, in light of *Thompson v. Keohane,* ⸺ U.S. ⸺, ⸺, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995), and *Ornelas,* the issue whether an interrogation is "custodial" in nature is subject to de novo review), *cert. denied,* ⸺ U.S. ⸺, 117 S.Ct. 999 (1997). Accordingly, we believe that *Ornelas* requires that the ultimate question of whether a confession is voluntary is a matter of law that must be reviewed de novo in this court. Nevertheless, we hasten to emphasize that the determination of the historical facts of the case are the proper domain of the trial court and that our review of its findings in that regard will be for clear error.[8] With these principles in mind, we turn to an examination of the case before us.

## II

At the outset, we think it is important to note that this case is hardly the typical one in which the voluntariness of a confession arises. This case, unlike so many others that we see in the course of our work, does not involve formal police interrogation in a government facility dedicated to law enforcement work. Nor does it involve the usual face-to-face confrontation between law enforcement officers and the defendant. Rather, it presented to the district court, and now presents to us, the task of assessing whether, in the course of psychiatric treatment and observation in a government mental health care facility, a patient, then still in her minority, was subjected by government actors to the sort of questioning that reasonably contemplates the possibility of government prosecution. It further presents the issue of whether that questioning led to D.F.'s making the sort of inculpatory statements that are not the "product of a rational intellect and a free will." *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960).

We begin our task by recalling the Supreme Court's strong admonition, repeated by us in the foregoing discussion of standard of review, that our obligation to review de novo the ultimate issue of voluntariness in this case does not give us the authority to second-guess the district court's determination of the underlying historical facts with the same scrutiny. We have set out at some length in our earlier opinion those historical facts and we shall not repeat them here. Rather, with the able assistance of the parties in their Circuit Rule 54 supplemental

7. *See, e.g., United States v. Burns,* 15 F.3d 211, 216 (1st Cir.1994); *United States v. Bethancourt,* 65 F.3d 1074, 1078 (3d Cir.1995), *cert. denied,* ⸺ U.S. ⸺, 116 S.Ct. 1032, 134 L.Ed.2d 109 (1996); *United States v. Han,* 74 F.3d 537, 540 n. 1 (4th Cir.), *cert. denied,* ⸺ U.S. ⸺, 116 S.Ct. 1890, 135 L.Ed.2d 184 (1996); *United States v. Scurlock,* 52 F.3d 531, 535 (5th Cir. 1995); *United States v. Wrice,* 954 F.2d 406, 411 (6th Cir.), *cert. denied,* 504 U.S. 945, 112 S.Ct. 2286, 119 L.Ed.2d 211 (1992); *United States v. Kime,* 99 F.3d 870, 879 (8th Cir.1996), *cert. denied,* ⸺ U.S. ⸺, 117 S.Ct. 1015, 136 L.Ed.2d 892 (1997); *United States v. Rambo,* 74 F.3d 948,

953 (9th Cir.), *cert. denied,* ⸺ U.S. ⸺, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); *United States v. Hernandez,* 93 F.3d 1493, 1501 (10th Cir.1996); *United States v. Barbour,* 70 F.3d 580, 584 (11th Cir.1995), *cert. denied,* ⸺ U.S. ⸺, 116 S.Ct. 1445, 134 L.Ed.2d 565 (1996).

8. This case establishes, in light of intervening Supreme Court authority, a new standard of review for the voluntariness of confessions. Accordingly, it has been circulated to the entire court. No judge favored a rehearing en banc on this issue.

briefs, we address those areas in which our review now must be less deferential because of the need to apply a legal standard. We shall address each of these areas below.

### A.

■ In our first opinion, we elaborated at significant length about the requirement that any interrogation subject to the strictures of the Fifth Amendment must be at the hands of a government actor whose questioning is of a nature that reasonably contemplates criminal prosecution. *Id.* at 683. We noted in *D.F.–I* that, even if we assumed that the district court had misapprehended the scope of *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), "it is clear that the district court focused on whether the staff of the Center had assumed, as part of their function, the prosecution of D.F." 63 F.3d at 684. We then noted that the district court, "dealing with conflicting evidence and,

necessarily, with the credibility of witnesses," *id.,* concluded that the record established coercion—indeed, a bit of overreaching—by government officials. Staff members at the Center were either enlisted or volunteered to act as law enforcement surrogates in eliciting confessions from troubled teens. There is extensive evidence in the record of the close relationship between staff at the center and Protective Services, the juvenile court system, and the F.B.I. There is also evidence that many of the staff at the Center saw themselves as an arm of law enforcement.

857 F.Supp. at 1325–26. To the extent that this determination ought be considered a legal characterization of the Center personnel as state actors for purposes of the Fifth Amendment,[9] we have no hesitation, after having painstakingly traced the evidentiary trail through the record, in holding that such a characterization is appropriate in light of the case law discussed at length in our previous opinion.[10]

---

**9.** Although the government uses the term "law enforcement surrogates" in its Circuit Rule 54 statement, it does not dispute, with any substantive argumentation, this court's statement of the appropriate legal test in *D.F.–I.* There, after discussing at some length the applicable case law, we held that, "although a government employee need not be a law enforcement official for his questioning to implicate the strictures of the Fifth Amendment, his questioning must be of a nature that reasonably contemplates the possibility of criminal prosecution." 63 F.3d at 683. The government likewise did not dispute this court's formulation in its petition for rehearing and suggestion for rehearing en banc in *D.F.–I.* Nor did it seek review of that formulation in its petition for certiorari in the Supreme Court off the United States. Indeed, the Solicitor General represented to the Court that, if the government prevailed on its argument that the voluntariness issue ought to be determined de novo on appeal, "a question of characterization remains of whether law enforcement purposes had anything to do with respondent's 'spontaneous[ ]' disclosure in group therapy that she had killed her cousins, or with her subsequent confessions." Government's Petition for Writ of Certiorari at 23, *D.F.–I.* (No. 95–1491).

**10.** The district court explicitly found that there was a close relationship between the Center and Protective Services and that personnel from that Center "were either enlisted or volunteered to act as law enforcement surrogates." 857 F.Supp. at 1326. To a great degree, law enforcement's use of the Center's program stands unrebutted in the record. Specifically, the district

court's finding of coercion as a result of the cooperative effort of Protective Services and the Center is supported by the unrefuted testimony of record. The evidence shows that, after D.F. was admitted to the Center, Protective Services made contact with the person most responsible for her day-to-day treatment to advise him that D.F. was suspected of the crimes in question. R.30 at 283–84, 324. The record also reflects, in unrebutted testimony, that, in an effort to induce D.F. to disclose more information, this same Center worker conveyed Protective Services' assurance that it would "shelve" charges on certain written admissions D.F. had made "as long as she continued to make progress" at the Center. *Id.* at 302–03, 327–28. In other areas in which the significance of the testimony conceivably might have depended upon demeanor, the court specifically found that Protective Services not only was provided with information about her crimes but also was allowed to question her about further criminal activity. Specifically, the court found that, as part of this cooperative effort, the person at the Center most responsible for D.F.'s day-to-day care regularly had cooperated with the staff of Protective Services by arranging for the Protective Services representative to question D.F. on the ward (*Id.* at 290–91, 326), by supplying statements that D.F. made while at the Center (*Id.* at 292, 324–25, 402), and even by facilitating the procurement of a release so that Protective Services could examine D.F.'s treatment records (*Id.* at 293). Such findings are well supported in the record. We must respectfully defer to the fact-finder's findings and the reasonable inferences it drew from those facts. *Ornelas,* —— U.S. at ——, 116 S.Ct. at 1663.

## B.

In that earlier opinion, we also determined, at that time under a deferential standard of review, that the district court was not clearly erroneous in its conclusion that the confessions of D.F. were involuntary. Given the standard of review for confessions that we announce today, we have retraced our earlier steps through the record and come to the same conclusion as the district court. The district court found:

> Staff at the Center went to great lengths to encourage and develop her trust. They also employed a wide range of tactics to "encourage" her to talk about the crimes she had committed. Privileges were accorded based on, among other things, frank admission of crimes. Criminal admissions were forgiven subject to continued cooperation and disclosure. Individual staff questioned D.F. directly about her past crimes. Protective Services Staff were provided with information about her crimes, and were allowed to question her about further crimes.

857 F.Supp. at 1326. The district court, on the basis of these findings as well as others set forth in its opinion and more extensively reviewed in our first opinion, determined that the inculpatory statements were secured through psychological coercion and were not the "product of a rational intellect and free will." *Id.* (citing *Blackburn,* 361 U.S. at 208, 80 S.Ct. at 280–81). The court especially noted that the various "encouragement" techniques employed by the staff were highly coercive. *Id.*

Having retraced our earlier footsteps, we must conclude that the district court's findings of historical fact were solidly rooted in the record. Given the facts found by the district court, we reach the independent conclusion that the resulting confessions were not voluntary within the meaning of the Fifth Amendment.

## C.

Finally, as we explicitly acknowledged in our earlier opinion, 63 F.3d at 685, subsequent confessions are not necessarily tainted by earlier coerced statements. *See*

*Oregon v. Elstad,* 470 U.S. 298, 310–11, 105 S.Ct. 1285, 1293–94, 84 L.Ed.2d 222 (1985). Here, the district court made the explicit finding that the "staff pressured D.F. to repeat and expand upon her confession, even after she had retained an attorney and invoked her Fifth Amendment privilege against self-incrimination." 857 F.Supp. at 1326. Our review of the record confirms that there is ample support for the district court's determination. Upon independent review, we also must hold that these statements were involuntary. As the district court determined, the record reveals that, after the initial confession, the personnel of the Center continued D.F. in a structured environment that subjected her to constant pressure to repeat and expand upon the initial admission. As the Supreme Court noted in *Elstad,* there "is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question." 470 U.S. at 312, 105 S.Ct. at 1295.

Upon reviewing the voluntariness of the defendant's statements under the de novo standard that we also announce today, we must conclude that the statements are involuntary under the prevailing standards of the Fifth Amendment.

### Conclusion

Accordingly, the judgment of the district court is affirmed.

AFFIRMED.