In re:  **Michael J. ROVELL,**
Debtor–Appellant,

**Michael J. Rovell, Plaintiff–Appellant,**

v.

**American National Bank,**
**Defendant–Appellee.**

No. 98–3778.

United States Court of Appeals,
Seventh Circuit.

Argued April 6, 1999.

Decided Oct. 21, 1999.

Steven P. Rouse (argued), McKenna, Storer, Rowe, White & Farrug, Jennifer Kaiser, Mengus, Mikus & Molzahn, Chicago, IL, for Defendant–Appellee.

Lisa I. Fair (argued), Michael J. Rovell, Chicago, IL, for Debtor-Appellant.

Before KANNE, DIANE P. WOOD, EVANS, Circuit Judges.

KANNE, Circuit Judge.

When a law firm plagued by sloppy bookkeeping mistakenly writes a check that results in an overpayment to a private investigator who then decides to pocket the money, should the law firm's bank ultimately bear the loss? The appellant here, Michael J. Rovell, ("Rovell" or "Debtor"), thinks so. Given the facts of this case and the well established Illinois tort law of negligent misrepresentation, we believe the law does not compel such a result.

In the United States Bankruptcy Court for the Northern District of Illinois, the debtor sought a reduction in his debt based on alleged negligent misrepresentations by a bank-creditor, American National Bank ("ANB"). The bankruptcy court held that the bank could not be held liable for negligent misrepresentation as a matter of Illinois law because banks are not "suppliers of information." *Rovell v. American Nat'l Bank*, No. 95–B–21171 (Bankr.N.D.Ill. March 17, 1997). Furthermore, the court found Rovell had not reasonably relied on the bank's representations, an essential element of the tort. The district court partly reversed, finding that banks were in fact "suppliers of information" and could be held liable for negligent misrepresentation. *Rovell v. American Nat'l Bank*, 232 B.R. 381 (N.D.Ill. 1998). However, the district court, based on the bankruptcy court's findings of fact, agreed that Rovell's reliance on the alleged misrepresentation was unreasonable and therefore not compensable. Because we find that the bankruptcy court's determi-

nation of unreasonable reliance was not clearly erroneous, we will affirm.

## I. HISTORY

Rovell practiced law in his own firm in Chicago, but his work took him on occasion to Arizona and California, where he engaged the services of an Arizona private investigator, Patricia O'Connor, and her firm, Pretty Eyes Detective Agency. On August 30, 1994, pursuant to a fee agreement between Rovell and O'Connor, Rovell's firm wrote a check to O'Connor for her services. The check in the amount of $38,250 was not immediately cashed. About three weeks later on September 19, Rovell discovered that the firm had overpaid O'Connor by more than $10,000. Wishing to correct the mistake, Rovell directed his associate, attorney Lisa I. Fair, to contact their banker, ANB in Chicago, and inquire whether the check had been cashed. Fair called the firm's account representative at ANB, Linda Williams, to request a stop-payment order. Fair had only incomplete records of the transaction with Pretty Eyes and was unable to provide Williams with a check number for the check to be canceled.

The conversation that took place between Fair and Williams represents the crucial exchange in the case. Only Fair and Williams can testify as to its content, and they disagree on key points. Fair asserted that she called Williams and asked if the check had been cashed. Because she did not know the check number, she could only supply the account number, check amount and payee. Fair added that it might be in the range of six checks beginning with number 1084 but that she could not be sure because no record had been kept of the check number. Fair said that Williams put her on hold and then returned to report that the check had not cleared. Fair testified that she then asked for a stop-payment order to be issued and contended that Williams never told her that the bank could not stop payment without a check number. Fair also denied that

Williams advised her to wait before writing a replacement check. The correct number for the first check written to Pretty Eyes turned out to be 1105.

Williams recalled the conversation differently. She remembered Fair calling and not knowing the check number, but requesting a stop payment on checks numbered 1084 and 1086, neither of which had cleared the bank yet. Williams processed the stop-payment order on those two checks and said she cautioned Fair to wait a few days before writing the replacement. Williams, who had twenty-six years of banking experience, said she routinely cautioned customers not to write checks immediately after a stop-payment order had been issued but did not recall specifically telling Fair that a check number was necessary for a stop-payment order.

Williams processed the stop-payment order that day for checks 1084 and 1086, and the order took effect at the start of business the next day. Between the time Williams ended her conversation with Fair and the close of business that day, the check for $38,250 was presented for payment and cashed. Two days later, without waiting for the stop-payment confirmation order to arrive and without calling back to check on the status of the account, Fair wrote a replacement check for $27,284.50 and mailed it by overnight express mail to Arizona. That check also was cashed, causing Rovell to overdraw his account the following December. Despite the uncertainty surrounding the stop-payment order, Rovell never read or responded to the stop-payment confirmation orders and failed to open his monthly account statements for many weeks. Only when he realized that he had overdrawn his account and incurred penalties did Rovell become a dutiful and prolific correspondent with the bank.

In October 1995, Rovell initiated a voluntary bankruptcy under Chapter 11 of the Bankruptcy Code. ANB presented a claim on a secured line of credit for $50,-081.25, the validity of which is undisputed.

Rovell, however, filed an objection seeking to reduce the claim by the amount he lost due to the overpayment to Pretty Eyes. He asserted claims under Illinois law for breach of contract on the ground that ANB had promised to stop payment on the first check and negligent misrepresentation based on the bank's alleged "assurance that the check had not cleared and could be stopped."

The bankruptcy court denied both claims, ruling that the bank could not be held liable on the tort claim as a matter of Illinois law under *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 88–89, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982), because it was not a "supplier of information." The district court reversed that holding, but because we do not need to reach that issue, we will leave the interpretation of state law for Illinois courts to resolve. The · bankruptcy and district courts agreed, however, that Rovell's reliance on the bank's statements regarding stopping payment of checks was unreasonable and therefore denied the claim for setoff under the tort theory.

## II. ANALYSIS

On appeal, Rovell raises two issues. First, he argues that the district court should have reviewed the bankruptcy court's finding of unreasonable reliance *de novo*, rather than for clear error. Second, Rovell argues that the evidence, including the conflicting testimony of the two primary witnesses, was insufficient to support the bankruptcy court's finding that the bank had not negligently misrepresented the procedure for stopping payment.

### A. Standard of Review

■ Illinois law requires that the plaintiff show reasonable reliance on the defendant's misrepresented facts to prevail on a claim of negligent misrepresentation. *See Board of Education of Chicago v. A, C & S, Inc.*, 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580, 591 (1989); *see also Quinn v. McGraw–Hill Cos.*, 168 F.3d 331, 335 (7th Cir.1999). The bankruptcy court found that Rovell did not act out of reasonable reliance on the statements made by Williams when Rovell wrote a replacement check without waiting for the stop-payment order to take effect or for the first check to be canceled. The district court agreed with the bankruptcy court, but Rovell now argues that the district court should have engaged in a more rigorous review of the bankruptcy judge's finding.

■ An appellate court will overturn a lower court's findings of fact only where clearly erroneous, and conversely, it will apply less deferential *de novo* review to questions of law. *In re Bonnett*, 895 F.2d 1155, 1157 (7th Cir.1989). Rovell argues that "reasonable reliance" is a mixed question of law and fact and must be reviewed *de novo*. The cases of this and other circuits show him to be half right.

Reasonable reliance, as Rovell contends, involves the application of a legal principle to a set of facts, also known as a mixed question of law and fact as discussed in *Ornelas v. United States*, 517 U.S. 690, 696–97, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), and *United States v. D.F.*, 115 F.3d 413, 415 (7th Cir.1997). When the facts are established and the relevant standard is undisputed, the only remaining question can be "whether those facts satisfy the relevant standard." *Id.* In *Ornelas*, the district court was called upon to decide whether a particular set of facts gave rise to a "reasonable suspicion" or "probable cause" sufficient to support an investigatory stop and warrantless search. *Ornelas*, 517 U.S. at 695, 116 S.Ct. 1657. The Court held that a mixed question of law and fact was presented by the "decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Id.* at 696, 116 S.Ct. 1657.

■ We agree that reasonable reliance in the context of a negligent misrepresentation action likewise constitutes a mixed

question of law and fact when the fact finder—here the bankruptcy court—is called upon to apply a legal rule to the particular facts of a case. However, Rovell's characterization of the question does not automatically afford the bankruptcy judge's determination a less deferential review. The case law firmly establishes the proposition that a finding of reasonable reliance is reviewed for clear error, and the cases cited by Rovell, including *D.F.* as well as *Ornelas*, do not compel a contrary conclusion.

*Ornelas* and *D.F.* require an appellate court to apply rigorous review of lower court decisions where there is a compelling need for uniformity and clarity in the application of legal principles across courts. *See Ornelas*, 517 U.S. at 697, 116 S.Ct. 1657; *D.F.*, 115 F.3d at 416. This need is obvious in Fourth Amendment law to help guide law enforcement officers in making determinations of reasonable suspicion or probable cause before invading a person's privacy. The question of whether a bank customer reasonably relied on the representations made by a bank employee differs dramatically from the question faced by police officers in *Ornelas* and *D.F.*

*Ornelas* however cast in some doubt the level of review given to mixed questions of law and fact. *See, e.g., In re Krehl*, 86 F.3d 737, 742 (7th Cir.1996). Rovell contends that under *Ornelas*, all mixed questions must be given *de novo* review, but this proposition is too broad to prevail. Indeed, the recent case of *Cook v. City of Chicago*, 192 F.3d 693 (7th Cir.1999), which addressed the proper scope of review of mixed questions of law and fact, illustrates this point. In *Cook*, the district court applied the doctrine of laches to limit an employee's claim for back pay based on the employee's failure to inquire diligently about job vacancies. *Id.* We held that when a judge is called upon to "apply a legal doctrine (here, the doctrine of laches) to a set of facts ... the conclusion that he reaches is reviewed under a deferential standard and therefore reversed only if

deemed 'clearly erroneous' or (what amounts in most cases to the same thing) an 'abuse of discretion.'" *Id.* at 696 (citations omitted). The doctrine of laches, with its fact-intensive inquiry into issues such as unreasonable delay and material prejudice, is closely analogous to the type of inquiry a fact finder must conduct in determining the reasonableness of reliance.

Furthermore, we identified three factors—need for uniformity, the importance of correct application of doctrine and institutional competence—that were crucial in *Ornelas* but absent in *Cook* and absent here to dictate whether a mixed question should be reviewed *de novo* or for clear error. *Id.* at 697. As in *Cook*, reasonable reliance is an inquiry driven by the particular facts of each case. As such, "plenary review is not necessary to prevent inconsistency." *Id.* In contrast to a bedrock constitutional right such as the Fourth Amendment right at issue in *Ornelas* and *D.F.*, reasonable reliance is not of "such transcendent importance" to require firm appellate court control over its application. *Id.* Finally, it cannot seriously be questioned that trial judges and juries are better positioned to make the fact-intensive decision of whether one party induced another to rely reasonably on their words or actions.

Our holding here comports with the established rule in this circuit that reasonable reliance is left to the trial court and reviewed only for clear error. *See In re Adventist Living Centers, Inc.*, 52 F.3d 159, 163 (7th Cir.1995); *Bonnett*, 895 F.2d at 1158; *Azar v. U.S. Postal Service*, 777 F.2d 1265, 1269–70 (7th Cir.1985). Rovell's reliance on *In re Marrs–Winn*, 103 F.3d 584, 589 (7th Cir.1996), for the proposition that *de novo* review is appropriate for a mixed question of law and fact is misplaced. That case "rested solely on legal conclusions" and we held that legal conclusions are ordinarily subject to *de novo* review. *Id.* Here, however, we deal with a situation where both the law and

facts are clear and the issue is the proper way to apply the law to the specific facts in this case.

■ As we have stated in prior cases, the proper standard of review for a fact finder's determination of reasonable reliance is clear error. *See Bonnett*, 895 F.2d at 1157. Therefore, we will not disturb the lower court's ruling "simply because [the appellate court] is convinced it would have decided the case differently." *Id.* at 1157 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). If the record supports two permissible conclusions, "the factfinder's choice between them cannot be clearly erroneous." *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 309 (7th Cir. 1988).

### B. Reasonable Reliance

■ We cannot say that the bankruptcy court's determination that Rovell could not reasonably rely on Williams' advice that a check could be stopped immediately, even without a check number, constituted clear error. Accepting, as we must, the bankruptcy judge's finding that both Fair and Williams presented credible testimony, *see Bonnett*, 895 F.2d at 1157, we are faced with a probability that the conversation between Fair and Williams occurred as Fair recalled it equal to the probability that it occurred as Williams recalled it.

According to Fair's recollection, Fair gave Williams the amount of the check, Rovell's account number and the name of the payee. She could not tell her the check number, but instead provided her with a general range of possible check numbers, which it turned out, was far from the actual check number. Fair then testified that based on this sketchy information, Williams definitively told her the check had not been presented for payment but failed to warn her that she should wait until the stop-payment order could be processed before writing a replacement check.

Williams recalled Fair telephoning and providing her with two check numbers—1084 and 1086. Williams typed the numbers into the system and determined that neither had cleared the bank. Williams then remembered Fair saying she wanted to send a replacement check to Pretty Eyes, to which she responded, "Well, Lisa, you should wait a few days." When Fair said she would send a letter explaining that the first check was for the wrong amount, Williams questioned whether the payee could be trusted not to cash both checks.

Taking both memories of the conversation as credible, it appears therefore that this is a case of two honestly held, but differing, memories of a conversation. The question, however, is whether a reasonable person would rely on either version of this exchange, and it seemed clear to both the bankruptcy judge and district judge that they would not.

A reasonable person certainly would not immediately send a replacement check based on the conversation remembered by Williams with an explicit warning to wait a few days. Furthermore, the fact that Williams remembered expressing concerns to Fair about whether the payee was "reputable," would have put a reasonable person on notice that the situation presented a potential for danger.

Even accepting Fair's recollection of the conversation, it seems unreasonable to issue a replacement check before receiving any written confirmation that the check had been effectively stopped. Fair knew that the information she provided Williams for the stop-payment order was incomplete at best, lacking a vital piece of identifying information—the exact check number. One does not need to be a banker or versed in banking law to know that this is a vital piece of information for locating or stopping a check. It is, as the courts below noted, a matter of common sense.

Had Rovell waited until he received the confirmation orders, he would have seen that the stop-payment order covered specific check numbers, alerting him to the strong possibility that the order would not

be effective for other check numbers. In fact, Rovell, who often failed to review his monthly bank statements, cannot recall receiving the confirmation orders and apparently did not know they were in his own files until ANB asked for them during discovery. This hardly suggests reasonableness. Finally, we cannot say why Rovell was so anxious to resend a check to a payee who apparently had not been anxious to cash the much larger check sent three weeks earlier, but there certainly seems to be no evidence of a need so pressing that would make Rovell's unexplained haste more reasonable under the circumstances.

## III. Conclusion

Because the record supports the finding of no reasonable reliance, we cannot find that the bankruptcy court committed clear error in denying Rovell's negligent misrepresentation claim. The decision of the district court is

AFFIRMED.