In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 18-1528

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MATTHEW HIGGINS-VOGT,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:17-cr-20022 — **Colin S. Bruce**, *Judge.*

---

ARGUED OCTOBER 26, 2018 — DECIDED DECEMBER 21, 2018

---

Before WOOD, *Chief Judge*, and SYKES and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Concerned that the getaway driver to his armed robbery would provide information to the police, Matthew Higgins-Vogt shot the driver multiple times in a wooded area near the Sangamon River in Decatur, Illinois. He later confessed to the murder while detained in the Macon County jail awaiting trial on the robbery charge. Higgins-Vogt appeals the district court's denial of his

motion to suppress his statements, challenging their voluntariness. We agree with the district court that Higgins-Vogt's statements to law enforcement were entirely voluntary and therefore affirm.

In doing so we sound our strong disapproval of the role a particular individual, who portrayed herself as a mental health counselor, was permitted to play within the Macon County jail. The individual was not a licensed mental health professional, met multiple times with Higgins-Vogt, and pledged him her confidentiality, only then to urge him to talk to the police after hearing his confession to the murder. What occurred has all the earmarks of a bait and switch of extraordinary gravity and potential consequence for Higgins-Vogt. We affirm because it is clear that Higgins-Vogt, separate and apart from his statements to and interactions with the purported counselor, affirmatively and voluntarily chose to confess to the murder.

**I**

On April 3, 2015, Higgins-Vogt and his friend Kelton Snyder used a stolen shotgun to rob a Circle K gas station of $700. During the robbery, Paige Mars waited outside as the getaway driver. Three days later a sanitation worker discovered Mars's body, dead from multiple shotgun wounds. Later that month, state officials arrested Higgins-Vogt and charged him with armed robbery.

Higgins-Vogt confessed to Mars's murder while he was in state custody pending trial on the robbery charge. The events surrounding the confessions are unusual. During the month or so preceding his confessions, Higgins-Vogt met multiple times with Sharon Brown, a contractor working at

Macon County jail and holding herself out as a mental health counselor. This appeal requires that we examine the voluntariness of Higgins-Vogt's statements in light of his interactions with Brown—during both his so-called counseling sessions with her as well as his two subsequent interviews with law enforcement, in which Brown participated.

During this time period, even though he had been appointed counsel following his arrest for robbery, Higgins-Vogt never met with his attorney due to a conflict of interest on the attorney's part. Accordingly, the attorney was not present at the time of the confessions Higgins-Vogt now challenges on appeal. The appeal does not entail any claim regarding the absence of counsel.

We begin with Brown's role and position at the Macon County jail. Although employed by a private entity, Brown worked exclusively at the jail and had an office there. She provided what she characterized as "counseling" to inmates under the title of "Senior Law Enforcement Officer." While she had an undergraduate degree in psychology, Brown held no licenses in the field of mental health and received no training for her role at the Macon County jail.

In describing her work, Brown stated that her goal was to allow inmates to develop a sense of empathy for their victims because, "somewhere along the line in order to become incarcerated, you've made a victim." She pursued this objective by meeting with inmates. And the record shows she was generally free to do so at her discretion, either at the inmates' request or hers, and without supervision from anyone at the Macon County jail.

Shortly after entering the jail on the robbery charge, Higgins-Vogt requested to meet with Brown, who he had previously met while incarcerated as a juvenile. During this first meeting on April 16, 2015, Higgins-Vogt revealed to Brown that he murdered Paige Mars. Following the meeting, Brown created a "clinical progress note," in which she wrote that Higgins-Vogt not only told her about a person he killed, but also went into "great detail" about the murder and the murder weapon.

Brown's note is somewhat at odds with itself, and brings to light the dual and competing role she played while interacting with inmates. On the one hand, Brown recorded that Higgins-Vogt had not been charged with the murder and that she had "encouraged client to inform his attorney of all this information and informed client she could not tell police due to confidentiality." But despite pledging this confidentiality to Higgins-Vogt, Brown told him that she "wanted police to know so [the] murder victim's family could have closure." Brown later elaborated on her desire to make sure law enforcement learned of crimes that inmates confessed to her during their "counseling" sessions: "[w]hen an inmate, whether it be Matthew [Higgins-Vogt] or anyone, starts telling me details of things and they have already talked to a cop of some sort, I encourage them to continue to talk to the cop. For the one reason is that I can't repeat what is said to me. It is not my job to listen to crimes and the details of their crimes and hold that in for months." Brown's dual and competing objectives—promising confidentiality yet prodding disclosure—add substantial complexity to this case.

Over the ensuing weeks, Brown and Higgins-Vogt continued to meet. Beyond discussing the abuse Higgins-Vogt

suffered as a child, Brown tried to get Higgins-Vogt to gain empathy for Mars by discussing the Mars family with him. She also offered her views on how Higgins-Vogt's mental state might impact his criminal case, suggesting that he was suffering from a psychological disorder known as "disassociation." She discussed with Higgins-Vogt whether he might be eligible for placement in a mental health facility based on this disorder.

The interactions between Brown and Higgins-Vogt did not end there. On May 20, 2015, Higgins-Vogt told Brown that he wanted to meet with Detective Joe Patton, the lead detective investigating the Circle K robbery. Brown contacted Detective Patton and arranged a meeting, where Patton learned that Higgins-Vogt wanted to speak with him about the weapon used in the Mars murder. After Higgins-Vogt waived his right to have his attorney present, the parties moved into an interview room so the questioning could be recorded. The Macon County State's Attorney joined the interview at Higgins-Vogt's request.

Brown was present for the entire interview. She explained her role to Detective Patton in this way: "I encouraged [Higgins-Vogt] to speak to a police officer because I'm not one and I don't need to know this type of thing, but I'm supportive of him telling the truth and if he ever wants to say anything else, I'm supportive of that and I will encourage that." During the interview, Higgins-Vogt provided details about the location of the shotgun used to kill Mars, though he claimed to have learned that information secondhand from Kelton Snyder. The police then used the information to recover the murder weapon. Given the level

of detail Higgins-Vogt shared, Detective Patton was skeptical of Higgins-Vogt's denial of playing any role in the murder.

Throughout the May 20 interview, including while Detective Patton expressed doubt about whether Higgins-Vogt was being entirely truthful, Brown did not expressly contradict Higgins-Vogt's account or explicitly state that he had confessed to her to murdering Paige Mars. But Brown did not sit silent during the interview either. To the contrary, she asked questions and elicited incriminating admissions from Higgins-Vogt, some of which she presumably learned during her prior "confidential" meetings with him. For example, she pressed Higgins-Vogt to discuss gang activity in the Decatur area. More to the point here, Brown urged Higgins-Vogt to discuss the precise location of the murder weapon and the type of ammunition used. And after Higgins-Vogt had maintained he did not know anything about the Mars murder beyond the location of the murder weapon, Brown pressed him to reveal more information, strongly suggesting through her comments and questions that Higgins-Vogt was not telling the whole story.

A week passed between the May 20 interview and Higgins-Vogt's next contact with law enforcement. The record does not show whether Higgins-Vogt met with Brown during this time. On May 27, Higgins-Vogt decided he wanted to own up to killing Mars. He did so by affirmatively flagging down Correctional Officer John Mayer. Without warning or explanation, Higgins-Vogt told Officer Mayer that he wanted to confess to a murder and needed to speak to the police. Caught entirely off guard, Officer Mayer—who had no familiarity with the case and had never spoken with Higgins-Vogt about it—reacted by

asking Higgins-Vogt to fill out an inmate request form. Higgins-Vogt did so, writing: "I want to confess to the Paige Mars murder." Officer Mayer then notified the command office of this unexpected development. He also reached out to Brown because he noticed Higgins-Vogt appeared distraught and anxious.

When Brown arrived, Higgins-Vogt told her that he had a conversation with his girlfriend earlier that day and she admonished him that if he had murdered someone he should feel terrible about himself and deserved to be held accountable. Higgins-Vogt later described his discussion with his girlfriend as "the straw that broke the camel's back," leading him to confess to the murder.

Later that same day, Detective Patton arrived at the jail to interview Higgins-Vogt a second time. The interview began with Higgins-Vogt confirming that he knew his rights were still in effect. He then explained that he wanted to confess to the murder, stating that he could no longer live with it and wanted to "do what's right." Higgins-Vogt also insisted that he be able to tell his family and friends about his involvement in the murder before it became public, and Patton agreed. He then confessed in detail to killing Paige Mars. Brown was once again present for the entire interview and at times questioned Higgins-Vogt or commented on his statements, including, for example, on his psychological state at the time of the murder.

The next day Higgins-Vogt told his girlfriend that he had murdered Mars. He explained that he could no longer "live with it" and "had to come clean." That same day Higgins-Vogt called his mother and a family friend to tell them that

he had confessed to the murder of Mars. All of this was recorded.

Higgins-Vogt was ultimately indicted federally, and his state charges were dismissed. In federal court, Higgins-Vogt moved to suppress the statements he made on May 20 and May 27, arguing that his confessions were coerced by Brown, who held herself out as a mental health professional and pressured him to confess. The district court held a hearing at which multiple witnesses testified, including Higgins-Vogt and Brown. For his part, Higgins-Vogt testified that he would not have confessed but for Brown's pressure. For her part, Brown acknowledged not only that one of her goals in working with inmates was to get them to feel empathy for their victims, but also that she considered it important that police be appraised of criminal activity that she had learned from inmates. But Brown denied any role in assisting law enforcement and maintained that her goal in meeting with Higgins-Vogt was to allow him to "heal and have peace." The district court denied Higgins-Vogt's motion, finding that his statements on May 20 and May 27 were voluntary.

Higgins-Vogt then pleaded guilty to committing and conspiring to commit a Hobbs Act robbery (18 U.S.C. § 1951(a)), brandishing a firearm during the robbery (18 U.S.C. § 924(c)), and possessing a firearm as a previously-convicted felon (18 U.S.C. § 922(g)). In doing so, he reserved for appeal the district court's denial of his motion to suppress. The district court subsequently sentenced Higgins-Vogt to 60 years' imprisonment.

**II**

On appeal Higgins-Vogt presents two arguments, both related to the role that he contends Sharon Brown played in encouraging him to confess to the murder. First, he argues that Brown should have administered *Miranda* warnings and her failure to do so tainted his confessions on May 20 and May 27. Second, he argues that Brown, by holding herself out as a mental health professional but then questioning him during his interviews with the police, functioned as an agent of law enforcement and coerced his confessions to the Mars murder.

**A**

Higgins-Vogt's argument that Brown was required to administer *Miranda* warnings during their meetings is straightforward and need not occupy us long. *Miranda* warnings must be provided at the outset of any custodial interrogation by law enforcement. See *United States v. Patterson*, 826 F.3d 450, 454 (7th Cir. 2016). Imprisonment alone does not establish custody for *Miranda* purposes. *Howes v. Fields*, 565 U.S. 499, 507 (2012). Rather, "custody" is a term of art "that specifies circumstances that are thought generally to present a serious danger of coercion." *Id.* at 508–09. An individual free to end the interrogation and leave is not in custody. *Id.* at 509.

The record shows that Higgins-Vogt sought to meet with Brown on his own initiative and by his own choice. It is equally clear that he was free to end his discussions with her at any time. In these circumstances, we cannot conclude Higgins-Vogt was in custody within the meaning of *Miranda.* Accordingly, the law did not require Brown to administer

*Miranda* warnings before accepting Higgins-Vogt's invitation to meet with him.

B

So we turn to the voluntariness of Higgins-Vogt's confessions to the police on May 20 and 27. The central question is whether Brown, despite portraying herself as a mental health counselor, acted as an agent of law enforcement and imposed sufficient pressure on Higgins-Vogt to render his May 20 and May 27 confessions the result of her coercion rather than the product of his own free will. We review the ultimate question of voluntariness *de novo* and the district court's embedded factual determinations for clear error. See *United States v. Villalpando*, 588 F.3d 1124, 1127 (7th Cir. 2009).

A confession is voluntary if it is the product of a rational intellect and free will and "not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Id.* at 1128. In assessing voluntariness, we consider the totality of the surrounding circumstances and evaluate "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Among the factors to be considered is whether the defendant initiated contact with law enforcement. See *United States v. Cahill*, 920 F.2d 421, 427 (7th Cir. 1990).

In *Colorado v. Connelly*, the Supreme Court emphasized that some form of overreaching by the state must be present before a confession will be deemed involuntary: "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence in-

admissible under the Due Process Clause." 479 U.S. 157, 166 (1986). But the law does not require a badge and gun for someone to function as an agent of law enforcement. The state action inquiry is more practical, focusing on substance more than form. See, *e.g.*, *United States v. D.F.*, 115 F.3d 413, 419–20 (7th Cir. 1997) (recognizing that the case did not involve the "usual face-to-face confrontation between law enforcement officers and the defendant" but concluding that staff at a county mental health facility acted as agents of law enforcement).

Whether a private person acted as an agent of law enforcement turns on whether the government knew of and acquiesced in the conduct at issue, whether the individual sought to assist law enforcement, and whether the individual performed the conduct at the request of the government. See *United States v. McAllister*, 18 F.3d 1412, 1417–18 (7th Cir. 1994). In undertaking this inquiry, we are mindful that the same individual can play more than one role and the subject undergoing particular questioning may not appreciate the duality of that role. A prime example came in *Estelle v. Smith*, where the Supreme Court concluded that when a neutral court-appointed psychiatrist went beyond reporting to the court on the issue of the defendant's competence and instead testified for the prosecution "his role changed and became essentially like that of an agent of the State recounting unwarned statements." 451 U.S. 454, 467 (1981).

We faced an analogous situation in *D.F.* There we addressed "whether, in the course of psychiatric treatment and observation in a government mental health care facility," a juvenile defendant who confessed to murder was subject "to the sort of questioning that reasonably contemplates the

possibility of government prosecution" such that the facility staff should be considered agents of the state. 115 F.3d at 419. We held that the facility staff functioned as agents of law enforcement in eliciting statements from the defendant because the staff had a close relationship with protective services, the court system, and the FBI, and "saw themselves as an arm of law enforcement." *Id*. at 420.

So, too, for Sharon Brown here. Her own testimony at the suppression hearing makes clear that she acted with the purpose of assisting law enforcement. Brown portrayed her role at the jail as promoting the mental wellbeing of the inmates, but she also emphasized her goal of aiding in community safety and ensuring that victims of crimes got closure. She acted on the latter objective not only by encouraging inmates to disclose their criminal conduct to law enforcement, but also, in this case, by attending and participating in police interviews.

The record shows that Brown's participation bore fruit for law enforcement: she helped to elicit incriminating information from Higgins-Vogt, including, for example, details about the murder weapon and ammunition as well as gang activity in the local community—some of which she had presumably learned in prior conversations with Higgins-Vogt. Brown herself admitted as much by testifying that she sought to help law enforcement by asking Higgins-Vogt about gang activity because "I wanted him to acknowledge the fact that there was gang activity that was going on" and "wouldn't want any gang-banger living next to anyone and harming them." On this record, we have little difficulty concluding that Brown acted as an agent of law enforcement.

It matters not that law enforcement never sought Brown's assistance in interviewing Higgins-Vogt. Detective Patton and the State's Attorney knew Brown was present, never asked her to leave (to protect the full confidentiality of mental health counseling provided to inmates), and indeed permitted her to participate in the questioning. To be sure, the record shows that Higgins-Vogt requested Brown's presence during the interviews. But that does not alter the fact that law enforcement allowed Brown's active participation in the interviews, including by drawing out incriminating information from Higgins-Vogt that she had learned in conversations she pledged were confidential. All of this was sufficient to render her an agent of law enforcement.

The question then becomes whether Brown's actions amounted to coercion sufficient to overcome Higgins-Vogt's free will. The circumstances surrounding Higgins-Vogt's confessions point in both directions. While presenting herself as a mental health counselor, Brown was uniquely positioned to earn Higgins-Vogt's trust and exert influence over him. Her role became problematic once she began participating in the interviews with police without steadfastly honoring her pledge of confidentiality. This risk was exacerbated by Brown's aim of helping Higgins-Vogt develop empathy for his victim and her family, which she seemed to believe warranted her urging Higgins-Vogt to reveal his conduct to the police. Higgins-Vogt's interactions with Brown, which he understood to be confidential counseling sessions, combined with her later participation in law enforcement interviews, casts doubt on the voluntariness of Higgins-Vogt's statements. See *D.F.*, 115 F.3d at 421 (concluding that the defendant's statements made to mental health center staff during treatment were involuntary because the treatment was de-

signed to develop trust and encourage the defendant to discuss the crimes she had committed).

But Brown's conduct alone tells nowhere near the whole story. Weighing in the other direction are the many affirmative steps Higgins-Vogt took on his own volition, the cumulative weight of which show that his statements to law enforcement on May 20 and May 27 were knowing and voluntary. Higgins-Vogt was never required to meet with Brown; he reached out to her on his own initiative and confessed to murdering Mars. And in the intervening weeks between his initial conversation with Brown and his subsequent interviews with law enforcement, Brown never spoke to the police or prosecutors about Higgins-Vogt. Rather, the interviews with law enforcement came only on Higgins-Vogt's own initiative.

On May 20, Higgins-Vogt asked Brown to contact Detective Patton. The interview took place not in Brown's office but in a recorded interview room, after Higgins-Vogt had waived his right to have an attorney present and confirmed his desire to submit to an interview. This lies in stark contrast to the statements at issue in *D.F.*, which were secured during the mental health treatment sessions themselves. See 115 F.3d at 421. And while Brown did not strictly maintain the confidentiality of her communications with Higgins-Vogt, the information she alluded to during the interview did not drive Higgins-Vogt to come clean about the murder. Indeed, the May 20 interview concluded with Higgins-Vogt sticking to his story that he knew nothing about the Mars murder beyond the location of the murder weapon. Although the May 20 interview presents a close call, we cannot conclude that Brown coerced Higgins-Vogt

into divulging his knowledge about the location of the murder weapon.

The circumstances surrounding Higgins-Vogt's May 27 confession are more clear-cut. Every indication is that Higgins-Vogt chose to confess on his own accord, following a discussion earlier in the day with his girlfriend. At the suppression hearing, Higgins-Vogt admitted that this conversation was "the straw that broke the camel's back." And there is no suggestion in the record that Brown added any pressure or, for that matter, even spoke to Higgins-Vogt the day he made the choice to approach the correctional officer and tell him he wanted to confess to a murder. Before Higgins-Vogt had any contact with law enforcement or Brown, he was given an opportunity to revisit the question and instead chose to complete the inmate request form, affirmatively writing "I want to confess to the Paige Mars murder." And, at the outset of the May 27 interview, Higgins-Vogt confirmed that he understood his rights and wanted to provide additional information to the police. Only then did Higgins-Vogt tell the officers that he killed Mars and needed to get this information off his chest because he could no longer live with keeping it to himself and not owning up to what he did.

We also cannot conclude that Higgins-Vogt's earlier conversations with Brown tainted his May 20 and May 27 confessions. What transpired here is far afield from the facts in *Missouri v. Seibert*, 542 U.S. 600 (2004). There the Supreme Court disapproved of police officers questioning an individual without providing *Miranda* warnings and then immediately turning around and repeating the same interview after

providing the warnings—a two-step technique designed to evade *Miranda's* protections. See *id.* at 617.

Here, however, Brown was never required to provide *Miranda* warnings to Higgins-Vogt during their initial, voluntary meetings. Nor were those meetings so close in time, context, and circumstance to the later police interviews to support a conclusion that any coercion Brown may have imposed spilled over to the later interviews. See *Oregon v. Elstad*, 470 U.S. 298, 310 (1985). Even accepting that Higgins-Vogt may have felt some pressure to confess to law enforcement after choosing to divulge his crime to Brown, it is not the case that "the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion." *Id.* at 312.

Finally, we see nothing in the record to support Higgins-Vogt's suggestion that Brown exacted coercion by making a false promise of leniency to induce his confession. See *Villalpando*, 588 F.3d at 1128. On this score, Higgins-Vogt points to nothing beyond Brown's telling him that he had a psychological disorder that may ultimately allow him to enter assisted living. But even accepting all of that as true falls well short of demonstrating, as the law requires, that Brown's statements were tantamount to a promise that compelled him to confess to the Mars murder.

Taken in their entirety, all of the facts and circumstances show that Higgins-Vogt's decision to confess was the product of his own free will.

## C

The criminal justice system did not see one of its finer moments here. What most troubles us about the role Brown

played in the Macon County jail is the twofold reality that her pledge of confidentiality to Higgins-Vogt meant very little, yet nobody within the jail seemed to have any awareness of what was transpiring under the guise of mental health counseling. Nor can the police and prosecutors wash their hands of the whole affair by pointing out that they never recruited Brown to elicit a confession from Higgins-Vogt, especially where they benefitted from Brown's presence at and participation in the interviews. The stakes for those who stand accused are way too high for all of this to have occurred, to say nothing of the imperative of protecting the integrity of mental health counseling offered to inmates.

Yet, however troubled we are by what occurred here, the deliberate steps Higgins-Vogt undertook to confess to police demonstrate an affirmative choice on his part and eliminate any concern that his confessions were not entirely voluntary.

Accordingly, we AFFIRM.